552 P.2d 1208

**STATE of Arizona, Appellee,**

v.

**Larry CLEMONS, Appellant.**

**No. 1 CA–CR 1686.**

Court of Appeals of Arizona,
Division 1,
Department B.

July 29, 1976.

Bruce E. Babbitt, Atty. Gen., by Robert S. Golden, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by Michael G. Sullivan, Deputy Public Defender, Phoenix, for appellant.

## OPINION

WREN, Judge.

In this appeal from a determination of guilty of second degree burglary by the trial court, defendant makes the following assertions: (1) it was error to admit his tennis shoes into evidence, because they were discovered during a warrantless search of his mother's apartment; and (2) it was error to admit his statements into evidence.

## ADMISSION OF TENNIS SHOES

The search of a home conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions". *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In this case, defendant's moth-

er was approached at her place of employment by police officers and was informed that the police had reason to believe that her son was a suspect in a recent burglary, that a pair of tennis shoes, with prints matching those found on the door of the building broken into, were being sought, and that they were believed to be in her apartment, where the defendant also resided. She was asked if her son owned a pair of tennis shoes and answered in the affirmative. The officers then asked her for permission to search the apartment.

Defendant's mother agreed to go with the officers to her apartment. Arriving there, she entered the apartment, followed by the police, and the tennis shoes were eventually discovered. They were later admitted as evidence before the trial court.

■ Defendant urges two grounds upon which to support his position that the tennis shoes should have been suppressed. First, he argues that his mother was without authority to consent to the search of his bedroom. The defendant himself had earlier declined to consent to a search of the apartment. He stated that his mother did not permit him to let people into her apartment. In support of his argument, appellant relies basically on the cases dealing with the relationship between a hotel manager and tenant. See e. g. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). We find such cases distinguishable from the situation where a child is living at the residence of his parent, and hold that the parent may give consent to a search of the child's room. In this conclusion, we think the majority of courts are in agreement. See *United States v. Peterson*, 524 F.2d 167 (4th Cir. 1975); *Maxwell v. Stephens*, 348 F.2d 325 (8th Cir. 1965); see also, LaFave, "The Course of True Law . . . Has Not . . . Run Smooth," 1966 University of Illinois Law Forum 255.

In *United States v. Peterson*, supra, where the defendants were contesting the mother's right to consent to a search of her son's bedroom, the court noted that it was undisputed that upon her arrival, Mrs. Peterson assumed the absolute authority to speak on the right to search. The court also noted that at the time of the search, Mrs. Peterson had access to, and complete control of, the entire premises, including the bedroom used by her children. Furthermore, Mrs. Peterson maintained her home as a family home. It was made available to all her children living at home with her, and the children recognized it as belonging to the mother and as being under her control. The court relied heavily upon the fact that the daughter, in refusing consent to a search, told the police that *only* her mother had the authority to consent to a search. The defendant here, however, asserts that even if his mother had authority to consent to the search, such consent was not shown in this case. In addition to the facts noted above, an officer testified at the Motion to Suppress that upon arriving at the residence, defendant's mother entered and asked him if he wanted to go in. The officer then accompanied the mother into the residence and conducted a search with her. The mother testified at the hearing also, and stated that she did not have any objections to the officers coming into her home. However, she stated that she had not specifically asked them to come in. She agreed that she had consented to a search of her apartment, but stated that she thought she was the one who would be conducting the search. Nevertheless, she stated that the officers followed her into her apartment and that she did not have any objections to them coming in.

■ We think such evidence fully supports a conclusion of express or implied consent by the mother to a search of her apartment for the tennis shoes.

## ADMISSION OF STATEMENT

Defendant next argues that statements made by him should have been suppressed by the trial court. We agree and reverse for a new trial on this ground. The facts pertinent to a resolution of the issues raised by this argument are as follows:

On the morning following the burglary, officers of the Phoenix Police Department proceeded to the building which had been burglarized and conducted an investigation. Tennis shoe prints were found on a door which had been broken open, and led away from the building. The officers followed the prints to a residence and questioned the occupants about their possible involvement in the burglary. The residents denied any knowledge of the burglary and consented to a search of an outer building on their property. A search of the building disclosed property taken during the burglary, and the residents stated that defendant had been to their home the previous evening. The officers then proceeded to defendant's residence, his mother's apartment, and attempted to question him.

After he had been given Miranda warnings, defendant agreed to answer the officer's questions. However, instead of answering, he apparently began discussing his religion and refused to talk to anyone other than a black officer. Since there were numerous black males congregating about the area, the officers decided to call a black officer to conduct the investigation. Upon arriving at the scene, the black officer, Andrew J. Miller, suggested to defendant that the questioning would be more convenient, and the possibility of a disturbance less, if it could take place at the Sky Harbor briefing station. The officers testified at the voluntariness hearing and at the Motion to Suppress that defendant agreed to accompany Officer Miller to the Sky Harbor station.

After arrival, Miller gave appellant his Miranda warnings and proceeded to question him after he had agreed to answer the questions. Officer Miller asked the appellant if he had been at the residence noted above the night before, to which defendant responded that he had. Defendant also answered questions as to his whereabouts on the previous evening. The colloquy thus proceeded:

"OFFICER: How did you get into the building?

"SUSPECT: I am not saying nothing.

"OFFICER: Why did you break into the building?

"SUSPECT: I wanted to give money to my brothers and sisters, my momma ain't got nothing in the refrigerator.

"OFFICER: Where were you going to sell the stuff?

"SUSPECT: Somebody will buy it.

"OFFICER: Was anyone with you?

"SUSPECT: No, I am always by myself.

"OFFICER: Where do you get your money?

"SUSPECT: My friends give me money.

"OFFICER: Why don't you tell me about the burglary last night.

"SUSPECT: No man, I don't want to go to jail. They treat you like animals in there.

"OFFICER: Have you been in trouble before?

"SUSPECT: Yeah man, I even ripped off a brother one time and I felt bad afterwards.

"OFFICER: How did you get into the building?

"SUSPECT: Man, I can't tell you I don't want to go to jail.

"OFFICER: Did you put the stuff in the shed behind your sister's house?

"SUSPECT: Man, I ain't saying no more."

After the consent search of the mother's apartment, the officers, proceeded to the Sky Harbor briefing station and again questioned defendant about the case. According to the departmental report they escorted the suspect into the office for fur-

ther interrogation. Defendant was asked if he was responsible for the burglary. He was also asked if the tennis shoes, seized from his home, were his. He responded to both questions by shaking his head up and down, indicating yes.

In response to defense counsel's questioning, Officer Miller stated that following the response, "I am not saying nothing," he continued to ask questions.

"Q. [To Officer Miller]: Why did you ask further questions after that response?

"A. It's procedure.

"Q. That's procedure?

"A. Yes, you can't stop asking him questions.

"Q. You can't stop asking questions after—

"A. You can stop, but if you ask another question and you get a response, then you continue it.

"Q. Despite the fact that he told you he's not going to say anything?

"A. That's correct.

"Q. Is this normal procedure you follow when someone responds in a manner such as this?

"A. What do you mean? I don't understand what you mean.

"Q. Where they indicate to you they are not going to answer, they are not going to say nothing?

"A. They say that, but then they answer questions.

"Q. So you continued questioning him until you got the responses you were looking for?

"A. I questioned him as elicited on the report. I asked him one question and I asked him another one, and I got the response and I continued.

"Q. So you continued and continued, didn't you?

"A. That's right."

■ Defendant attacks the admissibility of the statements for two reasons: (1) the statements were made after an illegal arrest; and (2) the statements were taken in violation of Miranda. In support of the first ground, defendant argues that his arrest by the officers was made without probable cause and therefore any statements made thereafter should have been suppressed under the recent holding of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). However, under the facts and circumstances of this case, we find that there was no arrest of appellant, prior to the time Officer Miller placed appellant under arrest at the Sky Harbor station after his incriminating statement. No arrest was effected by the officers at their initial meeting with appellant. The defendant voluntarily accompanied Officer Miller to Sky Harbor for questioning. The evidence further supports the conclusion that this was a reasonable and expedient procedure, in light of the fact appellant did not want to be questioned inside his apartment and that numerous black males were gathering outside. The voluntary accompaniment of an officer from the place of their first encounter to a police station or some other place for further investigation cannot, without more, be considered an arrest. *Hart v. United States*, 316 F.2d 916 (5th Cir. 1963).

Finally, appellant argues that his statements were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the United States Supreme Court stated:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome

free choice in producing a statement after the privilege has been invoked." 384 U.S. at 473–74, 86 S.Ct. 1627–28.

Appellant argues that his right to cut off questioning was not "scrupulously honored." While many of the rigid requirements and restrictions of the *Miranda* mandate have been somewhat eroded this aspect has not. The United States Supreme Court recently addressed itself to the *Miranda* guidelines in *Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L. Ed.2d 313 (1975). While finding statements taken after the defendant had asserted his right to remain silent admissible, the high court held that the admissibility of a statement obtained after the person in custody has decided to remain silent, depended on whether his right to cut off questioning was "scrupulously honored." The court stated:

> "Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 96 S.Ct. at 326.

The Arizona Supreme Court has also recently applied these guidelines in the case of *State v. Sauve*, 112 Ariz. 576, 544 P.2d 1091 (1976).

■■ We think that any police interrogation procedure which ignores a plain statement by a suspect that he is not saying anything when questioned about a crime runs counter to the clear mandate of *Miranda*. We think that a more prudent procedure would be to cease questioning altogether, or in the alternative, when there is doubt as to whether the defendant indeed wishes to cut off questioning, the police should clearly determine the suspect's intent before resuming his questions. Such a practice would more fully insure that a suspect's right to cut off questioning be "scrupulously honored" and that the specter of custodial interrogations overcoming an individual's free choice would not become a reality. There can be no question but that the questioning conducted here by the two officers, subsequent to their search of defendant's mother's apartment, at the station house clearly violated *Miranda*. The suspect had been arrested, was in custody, and had stated that he wished to say nothing on at least four occasions prior to the time he was removed from his cell and again questioned by these officers.

Judgment and sentence reversed.

JACOBSON, P. J., and SCHROEDER, J., concur.