STATE of North Dakota, Plaintiff and Appellee,

v.

Dwight THOMPSON, Defendant and Appellant.

Cr. No. 578.

Supreme Court of North Dakota.

July 28, 1977.

Kent A. Higgins, Bismarck, for defendant and appellant.

Richard L. Schnell, State's Atty., and Thomas M. Tuntland, Asst. State's Atty., Mandan, for plaintiff and appellee; argued by Thomas M. Tuntland, Asst. State's Atty., Mandan.

PEDERSON, Justice.

This is an appeal from a conviction on two counts of burglary in a case where jury trial was waived.

## ON MOTION TO DISMISS APPEAL

■ On April 7 this Court heard Thompson's motion under Rule 11(d), NDRAppP, for an extension of time to transmit the record on appeal. Rule 2, NDRAppP, provides:

"In the interest of expediting decision, or for other good cause shown, the supreme court may, except as otherwise provided in Rule 26(b), suspend the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction."

By an unpublished minute order from this Court, Thompson was granted until April 18 to serve and file his appellant's brief, the State was given until May 2 to serve and file its response, and the case was set for oral argument at the May term of court. On April 22, the State, not having received service of the appellant's brief, filed a motion to dismiss the appeal.

Counsel for Thompson argued that dismissal of the appeal was too drastic a remedy; that it would be a more appropriate sanction for this Court to assess costs. Under the circumstances here, where the State has not been materially prejudiced, where the default is that of the lawyer and not the client, and where the presentation of the case to this Court for decision has not been delayed, we prefer to reach the merits and we conclude that it is an appropriate exercise of discretion and in the further-

ance of justice that we deny the motion to dismiss.

As we said in *McCullough v. Swanson,* 245 N.W.2d 262, 265 (N.D.1976), we cannot permit previous admonitions to be disregarded or to be treated as empty noise. See also, *State v. Howe,* 257 N.W.2d 413 (N.D.1977). We assess motion costs of $250.00 in favor of the State and against the appellant.

## ON THE MERITS

About 5 or 5:30 p. m., April 26, 1976, Dwight Thompson arrived voluntarily at the Burleigh County jail to visit Michael Morrell, who had previously confessed to several burglaries in Burleigh and Morton Counties. Morrell apparently had implicated Thompson. Deputy Sheriff Peck refused to permit the visit but, upon learning of Thompson's identity, asked him to stay while he checked out a possible warrant for Thompson's arrest in Morton County. After a short delay, Peck learned that there was a Morton County warrant. He then made an arrest on the Morton County charge and "gave Thompson the *Miranda*[1] warnings," and was assured by Thompson that he understood his rights.

Peck then asked Thompson if he would make a written statement as to his part in the burglaries. Thompson agreed that he would do so but, after a bare start (one or two lines), he said he wanted to think about it first. Thereafter, Peck and Thompson engaged in additional "informal conversation," which included a question by Peck as to whether Thompson admitted being involved in any of the burglaries. Thompson said he was involved in the burglaries on Main Avenue. This admission appears in the record of the suppression hearing but, for some unknown reason, was not introduced as evidence at the trial.

When Peck asked about the possible return of the stolen merchandise, Thompson said he had nothing at his home nor in his car. He consented to a search of his car,

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

which was in the parking lot near the jail. From the trunk of Thompson's car, Peck seized some new tools—a hammer (Exhibit 35), a Phillips screwdriver (Exhibit 34), and battery clamps (Exhibit 22). Evidence introduced indicated that items of the same type were missing from the two Morton County burglaries.

As the search by Peck, with Thompson's cooperation, was about ended, Deputy Sheriff McClure from Morton County arrived in the parking lot with the arrest warrant and a warrant authorizing a search of the car. McClure served the arrest warrant on Thompson and received from Peck the tools seized. McClure tagged the items and apparently assumed custody of Thompson, but did not give *Miranda* warnings nor did he question Thompson.

McClure then learned that a Bismarck police officer, Frohlich, wanted to talk to Thompson, so he was taken across the street to the Bismarck police headquarters. Frohlich gave Thompson the *Miranda* warnings, then asked Thompson if he would talk about burglaries in Bismarck. The reply was that "he wanted to make a deal." Frohlich refused to discuss a deal. Testimony at the suppression hearing, from both Frohlich and McClure, disclosed that Thompson then indicated that he did not wish to talk.

At this point, Morton County Deputy Sheriff Hoffman entered the Bismarck police headquarters and asked to have a few minutes of Thompson's time. Taking Thompson into an adjoining room, Hoffman again gave the *Miranda* warnings. Hoffman testified that he then told Thompson that "the jig is up" and that, after a short conversation, Thompson admitted his participation in the two Morton County burglaries as well as some others, and showed Hoffman where the loot was hidden. This was at about 7:15 p. m., or about two hours after Thompson first arrived at the Burleigh County jail.

Thompson argues that all of the evidence acquired from or through him, subsequent to the time that he informed Deputy Sheriff Peck that he wanted to think about it first before making a written statement, is "tainted fruit"[2] and should have been suppressed, and should not have been admitted at the trial under the applicable exclusionary rule.

At the conclusion of the suppression hearing, Rule 12(b)(3), NDRCrimP, the trial court found as a fact that, after being given the *Miranda* warnings (on three separate occasions), Thompson "at no time indicated a desire to remain silent," and that he indicated only that "he would like to think about giving a written statement," and "his only interest appeared to be making some kind of deal." The trial court's conclusion of law was that Thompson's statements and the derivative evidence were freely and voluntarily given and were not the result of any force, threats, custodial coercion, other coercion, promises or improper influence of any sort.

Thompson's argument is (1) that there was a sufficient indication of his wish to remain silent, if not when he first stated that "he wished to think about" making a written statement, then certainly when he informed Frohlich and McClure that he did not wish to talk; (2) that his right to remain silent was not "scrupulously honored" when he was interrogated three times in about one hour; (3) the testimony of the accomplice (Morrell) was not sufficiently corroborated, as required by § 29–21–14, NDCC, when all inadmissible evidence is excluded; and (4) the findings and conclusions made by the court after the suppression hearing are erroneous as a matter of law.

In reviewing the order denying suppression we must consider matters of burden of proof and scope of review. In *Lego v. Twomey,* 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), Justice White, writing for the majority, said that " * * * no substantial evidence has accumulated

**2.** *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). See also, Pitler, *"The Fruit of the Poisonous Tree," Revisited and Shepardized,* 56 Cal.L.Rev. 579 (1968).

that federal rights have suffered from determining admissibility [of a confession] by a preponderance of the evidence." The Supreme Court of Arizona, in a fairly recent decision, said:

"A hearing was had prior to trial on the question of the voluntariness of the defendant's statements. As required by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) the trial court heard the evidence concerning the taking of the statements from the defendant. After hearing the evidence the trial court ruled that the confession was admissible because it was voluntarily made. Since *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) the burden of proof in a voluntariness hearing is by a preponderance of the evidence. The record of the hearing supports the conclusion of the trial court that the statements of the defendant were voluntarily made." *State v. Arredondo*, 111 Ariz. 141, 526 P.2d 163, 166–167 (1974).

■ This Court has not considered this point since *Miranda*; however, we see no reason at this time why we should not reaffirm what we said in *State v. Nagel*, 75 N.D. 495, 28 N.W.2d 665, 677 (1947):

"As to whether a confession is voluntarily or involuntarily made is a matter to be determined in the first instance by the court. And where the evidence is conflicting, such determination by the court will not be disturbed on appeal unless manifestly against the weight of the evidence."

■ The State has a heavy burden to show a waiver of the constitutional right to remain silent, and that statements made after an indication of a wish to remain silent are, in fact, voluntary. See *State v. Manning*, 134 N.W.2d 91, 97 (N.D.1965). We find that the determination of voluntariness made in this case was manifestly against the weight of the evidence. The record of the suppression hearing contains testimony by both Frohlich and McClure that Thompson had indicated that he did not wish to talk after learning that he could not make a deal. There was no contradictory testimony at that hearing.

Because Thompson did not appeal the suppression order but waited until a judgment of conviction was entered, from which he appealed, it is necessary that we consider separately the issues which challenge the conviction itself.

■ Thompson relies principally upon a statement made by this Court in *State v. Iverson*, 187 N.W.2d 1, 13 (N.D.1971), where we said, in reference to *Miranda* warnings:

"Once these warnings have been given and the individual in any manner indicates he wishes to remain silent, the interrogation must cease."

As a general statement this does guide law enforcement personnel in the performance of their function, however, it does not foreclose a defendant from voluntarily making a statement and waiving his constitutional rights at any stage of an investigation or prosecution.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), Justice Stewart, writing the majority opinion of the court, explains a passage similar to the quote from *Iverson, supra*, in *Miranda v. Arizona*, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which states:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion,* subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473–474, 86 S.Ct. at 1627. [Emphasis added.]

Justice Stewart's words were:

"This passage states that 'the interrogation must cease' when the person in

custody indicates that 'he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible. [Footnote omitted.] The passage could be literally read to mean that a person who has invoked his 'right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize 'any statement taken after the person invokes his privilege' as 'the product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite."

■ The statement is then made that any of these possible literal interpretations would lead to absurd and unintended results. *Miranda* did not create a *per se* proscription. *Michigan v. Mosley, supra.*

Thompson attempts to distinguish *Mosley* from this case on several grounds: (1) in *Mosley* there was a two-hour interval between interrogations; (2) in *Mosley* the second interrogation dealt with an offense unrelated to that to which the first interrogation related; (3) in *Thompson* there was only a short interval between interrogations; (4) in *Thompson* there were three interrogations and all related to a series of burglaries.

■ Thompson also argues that *Mosley* never asked for counsel but that he, Thompson, did. The evidence upon which Thompson relies in stating that he requested counsel is a statement by his attorney, not at the suppression hearing but immediately before trial, which the attorney labeled as an offer of proof. We find that no valid offer of proof was made and that there is no evidence in the record which supports the statement that Thompson requested counsel.

One of the questions confronting us is whether the exclusionary rule pronounced by the United States Supreme Court in *Miranda,* and other cases, requires a different scope of review than that described in *State v. Nagel, supra.* We conclude that it does not.

In *Mosley, supra,* the court referred to a person's right to cut off questioning, to control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation.

Unlike *Mosley,* we are not, in this case, able to find that Thompson controlled the time when questioning was allowed or that he, in any way, volunteered the information subsequently acquired from him by Officer Hoffman.

A somewhat similar situation occurred in *United States v. Gay,* 522 F.2d 429, 431–432 (6th Cir. 1975), where the defendant refused to respond to questioning on three separate occasions before confessing. Each time he was given a statement of his rights and each time interrogation ceased, not upon a refusal to talk but upon defendant's denial of participation in the crime. During defendant's second questioning, he indicated a desire to cooperate and consented to a search of his car. At the third questioning, he confessed. The court found that the suspect never refused to discuss the matter. Unlike *Gay,* in the instant case we are able to conclude that there was a sufficient refusal to talk.

Another Sixth Circuit case, *Williams v. State of Ohio,* 547 F.2d 40 (6th Cir. 1976), also involved three separate questionings, each with *Miranda* warnings. Finding that the statement was not taken in violation of Williams' constitutional rights, the court said that the statement was voluntarily given after learning that a co-conspirator had implicated him, and was made "in an attempt to improve his own chances."

In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court, without commenting on the merits of the cases, listed in a footnote what it called "the vast majority" of federal and state court decisions which have con-

cluded that *Miranda* does not create a *per se* proscription of any further interrogation once the person being questioned has indicated a desire to remain silent.

We have examined numerous cases, in addition to those cited in *Mosley,* and find that the courts have looked at the evidence to determine what other factors are present, in addition to a questioning after an indication of a desire to remain silent.[3]

In this case we are concerned whether the State produced evidence which indicates that Thompson had a change of mind as the product of intelligent, voluntary action or of ignorance or confusion. See *United States v. Johnson,* 529 F.2d 581 (8th Cir. 1976). We conclude that when Thompson said that "he wished to think about" making a written statement, and then immediately, in an "informal conversation" orally admitted involvement in various burglaries and consented to a search of his car, he was not in fact announcing a desire to remain silent; however, the admission then made was never introduced into evidence and the fruits of the car search were never clearly tied to any burglary.

We further conclude that Thompson's right to remain silent after he did thereafter clearly communicate to Frohlich and McClure the desire not to talk was ignored, and his subsequent statement to Hoffman was never shown to be clearly the result of an intelligent evaluation of new information causing him to change his mind. We agree with the Arizona Court of Appeals, which said:

"We think that any police interrogation procedure which ignores a plain statement by a suspect that he is not saying anything when questioned about a crime runs counter to the clear mandate of *Miranda.*" *State v. Clemons,* 27 Ariz.App. 193, 552 P.2d 1208, 1212 (1976).

Perhaps Hoffman did not know that Thompson had made known his claim of a right to remain silent. Lack of communication between participating officers cannot be substituted for the necessary strong proof of an intelligent, uncoerced, voluntary waiver of the right to remain silent. Had Hoffman known of Thompson's previous decision to remain silent, it is doubtful that he would have proceeded with interrogation without inquiring whether there had been an intelligent change of mind.

We accordingly conclude that Thompson's admission, after he had informed Frohlich and McClure of his desire to remain silent, should have been excluded. Although there is some vagueness in the testimony, it is uncontradicted that both Frohlich and McClure understood Thompson to say that he did not wish to talk. In light of that testimony, the district court's finding that at no time did Thompson indicate a desire to remain silent is clearly an erroneous finding and the conclusion based thereon is error as a matter of law. The determination is manifestly against the weight of the evidence.

On the question of corroboration of the testimony of the accomplice under § 29–21–14, NDCC, we find that when all of the inadmissible testimony is stricken, there is no corroborating evidence in the trial record of the nature required, which connects Thompson with the commission of the crime. See *State v. Anderson,* 172 N.W.2d 597, 600 (N.D.1969).

We decline to dismiss the appeal but assess costs in the sum of $250 in favor of the State. The judgment of conviction cannot stand and is reversed. As concluded by the United States Supreme Court in the case of *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), we, too,

---

3. *United States v. Jakakas,* 423 F.Supp. 564 (E.D.N.Y.1976); *Williams v. Brewer,* 509 F.2d 227 (8th Cir. 1974), *cert. granted,* 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1975); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Williams v. State of Ohio,* 547 F.2d 40 (6th Cir. 1976); *United*

*States v. Williams,* 526 F.2d 1000 (6th Cir. 1975); *State v. Snethen,* 245 N.W.2d 308 (Iowa 1976); *State v. Boggs,* 16 Wash.App. 682, 559 P.2d 11 (1977); *United States v. Olof,* 527 F.2d 752 (9th Cir. 1975); *United States v. Davis,* 527 F.2d 1110 (9th Cir. 1975).

conclude that the State is entitled to retry the case. A new trial is granted.

ERICKSTAD, C. J., and VOGEL, SAND and PAULSON, JJ., concur.