**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Jeffrey Clay CARLSON, Defendant and Appellant.**

**Cr. No. 803.**

Supreme Court of North Dakota.

April 21, 1982.

---

John P. Van Grinsven III, Asst. State's Atty., Minot, for plaintiff and appellee State of North Dakota.

Bruce R. Montgomery, of Teevens, Johnson & Montgomery, Minot, for defendant and appellant.

VANDE WALLE, Justice.

Jeffrey Clay Carlson appealed from the judgment of conviction for arson [Section 12.1–21–01, N.D.C.C.] entered after a bench trial by the district court, Ward County. We affirm.

Carlson's conviction was based upon a confession he made to Minot police officers on March 5, 1981. Carlson's attorney sought to suppress the statements Carlson made to police on March 4, 1981, and the March 5 confession. The trial judge suppressed the March 4 statements but admitted the March 5 confession. The sole issue is whether or not the trial judge erred when he refused to suppress the confession Carlson made on March 5, 1981.

In the early morning hours of March 4, 1981, a fire destroyed a detached residential garage in Minot. The owner told Norman Nevland, of the Minot Police Department, that she suspected Jeffrey Carlson of starting the fire. Nevland contacted the police station at approximately 8 a. m. and requested that another officer go to Carlson's home and "ask Mr. Carlson to come down and talk to me about the fire." An officer went to Carlson's home, where he was living with his parents. Carlson's parents

awakened him, Carlson dressed, and the officer took him to the police station. The officer was not in uniform nor was the police car marked. They arrived at the police station shortly after 8 a. m. and Carlson was given the *Miranda* warnings.[1] He was not told that he was under arrest nor that he was free to leave if he wished. Carlson had been at a party the night of the garage fire and had consumed 9 to 25 glasses of beer. Carlson arrived home at 4 a. m. and had four hours of sleep before he was taken to the police station.

At the police station Carlson was questioned about the fire and he denied any involvement. When asked if he would consent to a polygraph test, Carlson agreed. The polygraph test was administered between 11 and 12 o'clock that morning. When confronted with the results of the polygraph test, Carlson confessed to setting the fire in the garage. Officer Nevland took Carlson home sometime between 12:30 and 1 p. m. Although the reason is disputed, Carlson returned to the police station on March 5, 1981, at 10 a. m., and executed a formal written confession admitting that he had started the garage fire.

After a suppression hearing, the trial judge suppressed all statements made by Carlson on March 4, 1981:

"In spite of the contention of the State that the Defendant's presence [at the police station on March 4] was a result of an invitation, the Court finds that the facts in this case come squarely within the principles set forth in the case of *Dunaway v. State of New York, supra* [442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824]. The Defendant was aroused from what was obviously a deep sleep (heavily supported by a prior evening of drinking) early in the morning. The presence of the officers, although not in uniform, was not consistent with a voluntary invitation. The following of the Defendant on at least two occasions to the restroom by

---

1. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right

to the presence of an attorney either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966).

a police officer is incompatible with a voluntary presence. The interrogation was lengthy, although as set forth by the State's brief it had several interruptions for periods of waiting, testing, etc. The Court, therefore, suppresses any statements made by the Defendant to the police on March 4, 1981."

The trial judge's decision to suppress the statements Carlson made on March 4 has not been appealed. We need not consider the trial judge's decision to suppress those statements. We accept it as only one of the facts in the record before us. We assume, without so deciding, that the statements made on March 4 are inadmissible.

The trial judge concluded that the March 4, 1981, statements should be suppressed because the circumstances surrounding the statements were within the decision of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, the Court considered the legality of custodial questioning on less than probable cause for a full-fledged arrest. 442 U.S. at 202, 99 S.Ct. at 2251, 60 L.Ed.2d at 829. The issue arose when Dunaway made inculpatory statements after receiving *Miranda* warnings during custodial interrogation following seizure on less than probable cause. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), a case involving facts similar to *Dunaway*'s, the Court held that *Miranda* warnings are not a *per se* cure for Fourth Amendment violations. In order to use inculpatory statements made by a defendant during custodial interrogation after being seized on less than probable cause the prosecution has two hurdles to clear: "the prosecution must show not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connection between the statements and the illegal arrest is broken sufficiently to purge the primary taint of the illegal arrest in light of the distinct policies and interests of the Fourth Amendment." *Dunaway*, 442 U.S. at 204, 99 S.Ct. at 2252, 60 L.Ed.2d at 830. The Court found that the detention of Dunaway was in important respects indistinguishable from a traditional arrest, i.e., he was not questioned briefly where he was found, he was taken to a police car and transported to a police station, he was placed in an interrogation room, and he never was informed that he was free to go. 442 U.S. at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 835–836. The Court concluded that the treatment of Dunaway, whether or not technically characterized as an arrest, must be supported by probable cause. 442 U.S. at 214, 99 S.Ct. at 2257, 60 L.Ed.2d at 837. Detention without probable cause in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 679 (1969), when the defendant was subjected to interrogation, was found to violate the Fourth Amendment. "*Brown v. Illinois* [citation omitted], similarly disapproved arrests made for 'investigatory' purposes on less than probable cause." *Dunaway*, 442 U.S. at 215, 99 S.Ct. at 2258, 60 L.Ed.2d at 838. Both *Brown* and *Davis* reflect the conclusion that detention for custodial interrogation, whether for questioning, investigation, or for some other reason, "intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838.

The trial judge concluded that the circumstances and the questioning on March 4 were "coercive influences" upon Carlson. The trial judge also concluded that the circumstances surrounding Carlson's presence at the police station and the several hours of intermittent questioning fell within the custodial interrogation condemned in *Dunaway*. As stated above, we are not reviewing the suppression of the March 4 statements nor do we intend any of our remarks here to be read as approving or disapproving the trial judge's decision to suppress the statements. For the purposes of this opinion only, we assume that the March 4 statements are inadmissible.

The trial judge did permit the use of Carlson's March 5 confession. The reason the confession was not suppressed is that the trial judge concluded that the coercive influences no longer were present and Carlson had sufficient time free of police conduct to appreciate the situation:

"The efforts to distinguish between inadmissible confessions [of March 4] and their fruits are sometimes less than clear. The second statement [March 5] presents a special problem that arises frequently in confession cases when considering the effect of an inadmissible statement upon other statements taken from the accused at later times during the investigation.

"One of the things that is considered is the purpose and flagrancy of official misconduct. In this case the Court does not find that the officers were guilty of flagrant and malicious misconduct. Their zeal to solve a serious crime ran them afoul of certain technical requirements; however, the Court does not find the second statement given by the Defendant was an exploitation of the coercive influences of March 4th. Prior to obtaining the second statement there was an overnight break and a period of nearly 24 hours lapsed. The Court finds there was a significant break in the stream of events to permit the accused to 'revitalize his capacity for self-determination.' McCormick on Evidence, 2nd Ed. (1972) 345. Further, the Court finds that any coercive influences that existed on March 4th were no longer operative. The record is devoid of any evidence that on March 5th the accused was other than rested, clear-headed, and that his actions were totally voluntary."

Carlson's argument is that the trial court erred by not ruling that the March 5 confession was a product of the illegal search and seizure of his person by the police, i.e., a result of his statements on the previous day, and therefore inadmissible.

Because the trial judge ruled that the statements made on March 4, 1981, were not admissible due to the *Dunaway* decision, we must determine whether or not the connection between this "unconstitutional police conduct and the incriminating statements ... was nevertheless sufficiently attenuated to permit the use [of the statements] at trial ..." *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838. Even if Carlson's statement on March 5

were voluntary, our analysis is not completed: "although a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment [footnote omitted], this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis [citation omitted]. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." *Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839. Therefore, we must first determine whether or not Carlson's March 5 statements were made voluntarily.

■■■■ This court has previously considered whether or not a defendant's statements or confessions were made in violation of the Fifth Amendment to the United States Constitution. In *State v. Klevgaard*, 306 N.W.2d 185, 195 (1981), we paraphrased the United States Supreme Court's decision in *Miranda v. Arizona* as saying that "a defendant could waive these rights [the *Miranda* warnings], but that any waiver must be made 'voluntarily, knowingly and intelligently.'" We consider the totality of the circumstances to determine whether or not a waiver is made voluntarily, knowingly, and intelligently. *Klevgaard*, 306 N.W.2d at 195. The standard of review which we employ when considering the totality of the circumstances is "whether or not a determination of voluntariness is manifestly against the weight of the evidence ..." *State v. Roquette*, 290 N.W.2d 260, 264 (N.D.1980).

The circumstances which we examine include the reason Carlson returned to the police station on March 5, whether or not Carlson understood the contents of the *Miranda* warnings, and why Carlson made the second statement. Carlson testified that he returned to the police station because he thought he was to be arrested. The basis for this conclusion is that he thought that his March 4 statement was sufficient to implicate himself. Officer Nevland testified that he asked Carlson to return on March 5 to give a statement in writing. Nevland also testified that Carlson was told on March 4 "we wouldn't be arresting him

until we had all the paperwork up to the state's attorney's office and they would get a warrant for his arrest and then we would call him to come into the station at a later date." When Carlson did return at 10 a. m. on March 5, it was approximately 22 hours later. Carlson's father provided him with a ride to the police station, although Carlson apparently was alone with the police officers when he gave the second statement. Officer Nevland testified that on March 5 he asked Carlson "to tell me in his own words what took place on the morning of the 4th [of March] ..." The statement was taken down in shorthand and then typewritten. The statement was given to Carlson to read, make corrections, and sign. Carlson made two corrections, one at the beginning and one at the end; each corrected a misspelling of his name.

It is unclear whether or not Carlson was given the *Miranda* warnings on March 5. Officer Nevland testified that he did not think that they were given. Nevland testified, however, that another officer had told him that a form dated March 5 with the *Miranda* warnings and Carlson's signature acknowledging the warnings was in the files. In any event, Officer Nevland testified that he asked Carlson if he understood what his rights were, and Carlson said he did. There is no exhibit in the record to confirm that Carlson was given the *Miranda* warnings. Carlson then made the March 5 confession.

At the suppression hearing, Carlson testified that he had been given the *Miranda* warnings on March 5. When asked by his counsel whether or not he read it over carefully, Carlson said, "This time I read it. I took a little more time and thought about it." When cross-examined by the State's Attorney, Carlson testified that the confession was made voluntarily:

"Q. Mr. Carlson, are you asserting that this statement wasn't voluntarily given on your part, the one on March 5th?

"A. The one on March 5th was. The one stating I confessed to the fire—I don't think I. understand that question.

"Q. That statement, did you give that voluntarily on your part?

"A. Right.

"Q. And you indicate now that prior to giving that statement you do recall Officer Nevland advised you of your rights?

"A. Right."

Carlson completed high school. He stated that he can read and write. Carlson appears to have understood the content of the *Miranda warnings.*

Carlson testified at the suppression hearing that he gave the statement on March 5 because he had "already given the statement," presumably referring to the March 4 statement. The import of this statement by Carlson is that he felt compelled to repeat the statement he made on March 4 because he thought that he would be arrested afterward.

■ Carlson may have felt some obligation to return to the police station on March 5, but his return was made upon his own initiative. His father provided him with transportation. Nearly 22 hours elapsed between the time of the first statement. Carlson testified that he knew what his rights were. Officer Nevland testified that Carlson said he understood his rights. The March 5 statement when typed was read by Carlson and signed by Carlson and Officer Nevland and another witness within half an hour of the time that Carlson arrived at the police station. The following is contained at the end of the transcribed statement:

"Q. Yesterday you were advised of your rights. Is that correct, Jeff?

"A. Right.

"Q. Are you giving this statement to us voluntarily on your part?

"A. Yes, I am."

By looking at the totality of the circumstances we cannot say that the trial court's determination that the March 5 statement was voluntary is manifestly against the weight of the evidence.

Having determined the Fifth Amendment issue we may now reach the Fourth Amendment analysis: whether or not Carlson's statement of March 5 is admissible.

Carlson urges us to decide that the evidence upon which he was convicted, the March 5 statement, must be found inadmissible as "fruit of the poisonous tree." The test which we must follow in order to "vindicate the 'distinct policies and interest of the Fourth Amendment' ... [is] 'whether ... [the] statements were obtained by exploitation of the illegality ...'" *Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839, quoting *Brown v. Illinois*, 422 U.S. at 602 and 600, 95 S.Ct. at 2261 and 2260, 45 L.Ed.2d at 426 and 425. We must look at several factors to determine whether or not the confession was obtained by exploitation of an illegality: "the temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct ..." Ellipses in *Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259, 60 L.Ed.2d at 839, quoting *Brown, supra*, 422 U.S. at 603–604, 95 S.Ct. at 2261–2262, 45 L.Ed.2d at 416. This test focuses upon "'the causal connection between the illegality and the confession,' 422 U.S. at 603, 95 S.Ct. at 2261, [45 L.Ed.2d at 427, and] reflect[s] the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter police conduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts." *Dunaway*, 442 U.S. at 217–218, 99 S.Ct. at 2259, 60 L.Ed. at 839.

In both *Brown* and *Dunaway* the defendant was seized without probable cause in the hope that something might turn up, and a confession was obtained without any intervening event of significance. The fact that Dunaway was not threatened or abused and that the police conduct was highly protective of his Fifth and Sixth Amendment rights was not significant. Such an approach "betrays a lingering confusion between 'voluntariness' for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown*." 442 U.S. at 218–219, 99 S.Ct. at 2260, 60 L.Ed.2d at 840. In *Dunaway*, "No intervening events broke the connection between the petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.'" [Footnote omitted.] 442 U.S. at 219, 99 S.Ct. at 2260, 60 L.Ed.2d at 840. In *Brown*, the defendant was arrested illegally and in a manner which appears to have been calculated to cause surprise, fright, and confusion. The arresting officers conceded that the arrest was for investigation or for questioning. It is apparent that the officers in *Brown* hoped that the result of their illegal arrest and questioning would be to turn up evidence of a specific crime. The defendant in *Brown* also made two separate statements to the police which implicated him in a crime. The two statements were preceded by the *Miranda* warnings and were separated by less than two hours. The first statement was ruled as inadmissible by the Supreme Court and the second was also held to be inadmissible as the result and fruit of the first. *Brown*, 422 U.S. at 604–605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

During our consideration of the factual circumstances and the several factors from *Brown* and *Dunaway*, we keep in mind the language from which this test derives. In *Wong Sun v. United States*, the Court said: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been [obtained] by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, *Evidence of Guilt*, 221 (1959)." 371 U.S. 471,

487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). In *Dunaway*, the Court interpreted "the relevant inquiry as 'whether [the defendant's] statements were obtained by exploitation of the illegality of his arrest [quoting *Brown*],' 422 U.S. at 600, 95 S.Ct. at 2260; ..." 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839.

It is illusory to analyze the March 5 statement by Carlson only in terms of "fruit of the poisonous tree." To do so overemphasizes the prior illegality as the source of the disputed evidence. According to *Dunaway*, the inquiry must be whether or not the disputed evidence was obtained by exploitation of the illegality. This inquiry permits disputed evidence which logically derives from the illegality to be admissible when it is not a result of an exploitation of the illegality. Clearly, here, Carlson would not have returned on March 5 if he had not been at the police station on March 4. Because the trial judge has ruled that the March 4 statement was impermissibly obtained, it logically follows that the March 5 statement is in some ways a consequence of the March 4 illegality. However, we must determine whether or not it should be excluded because it was obtained as a result of an exploitation of the March 4 illegality.

The time which elapsed between the conduct which the trial judge decided was illegal, i.e., the custodial interrogation, and the March 5 confession was approximately 22 hours. During that time Carlson was home with his parents. The only intervening circumstance was the release of Carlson by the police on March 4. The significance is that there does not appear to be any police conduct toward Carlson during the intervening time period. The trial judge concluded that "the Court does not find that the officers were guilty of flagrant and malicious misconduct." We agree. Therefore, by applying the factual circumstances of this case to the several factors which must be used to determine whether or not the confession was a result of an exploitation of the illegal police conduct, we conclude, as did the trial judge, that the March 5 confession was not the result of an exploitation of the police conduct on March 4.

We affirm the judgment of conviction of Jeffrey Carlson.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.