STATE of North Dakota, Plaintiff
and Appellant,

v.

Randall A. DISCOE, Defendant
and Appellee.

Cr. No. 890.

Supreme Court of North Dakota.

May 12, 1983.

John P. Van Grinsven III, Asst. State's Atty., Minot, for plaintiff and appellant State of North Dakota.

Donald L. Peterson, of McGee, Hankla, Backes & Wheeler, Minot, for defendant and appellee.

VANDE WALLE, Justice.

The State appealed from an order of the district court of Ward County suppressing (1) a statement made by Randall A. Discoe to police officers while being questioned at the Minot police station and (2) evidence obtained from the trunk of Discoe's car following a consent to search. In its order, the trial court held that both the confession and the consent to search were involuntary. We affirm.

Essentially one issue is raised by the State in its appeal from the trial court's order: namely, did the trial court err in granting Discoe's motion to suppress the statement in question and in vitiating Discoe's consent to search his car? [1]

The central issue in a case challenging the validity of a confession is whether or not the confession was made voluntarily. *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *State v. Nagel,* 75 N.D. 495, 28 N.W.2d 665 (1947). Likewise, when the validity of a consent to search is called into question, the trial court must satisfy itself that the consent was given voluntarily before it can permit the use of evidence obtained from the search against the accused at trial. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Lange,* 255 N.W.2d 59 (N.D. 1977). And the way in which the trial court is to make its determination on the issue of voluntariness is by examining the totality of the circumstances which surround the giving of a confession or consent to a search to see whether it is the product of an essentially free choice or the product of coercion. *Schneckloth, supra; State v. Carlson,* 318 N.W.2d 308 (N.D.1982), *cert. denied* ——— U.S. ———, 103 S.Ct. 456, 74 L.Ed.2d 609 (1982); *State v. Roquette,* 290 N.W.2d 260 (N.D.1980); *Lange, supra.*

Under a "totality of the circumstances" standard, although the existence or absence of certain factors concerning (1) the characteristics and condition of the ac-

---

1. In a threshold issue, Discoe maintains that the State has failed to discharge its burden of establishing that the trial court's suppression order has rendered the proof available to the State with respect to the burglary charge against Discoe so weak in its entirety that any possibility of prosecuting such charge to a conviction has been effectively destroyed. See Sec. 29–28–07(5), N.D.C.C. Thus, he continues, the State's appeal should be dismissed.

In *State v. Dilger,* 322 N.W.2d 461, 463 (N.D. 1982), we said, with respect to the requirements which Section 29–28–07(5) imposes on the State in an appeal taken from a suppression order:

"We are reluctant to dismiss the State's appeal unless the prosecution's determination of the need for the suppressed evidence is clearly inconsistent with the record or is without foundation in reason or logic."

We believe the prosecution's statement explaining why the trial court's order has effectively destroyed any possibility of prosecuting the criminal charge to a conviction is not clearly inconsistent with the record nor without foundation in reason or logic. We conclude, therefore, that the State has established an adequate basis under Section 29–28–07(5) for its appeal from the trial court's suppression order.

cused at the time he confessed or consented and (2) the details of the setting in which the consent or confession was obtained are significant in deciding voluntariness, no one factor in and of itself is determinative. *Schneckloth, supra; State v. Munro,* 295 N.W.2d 437 (Iowa 1980); *Barrera v. State,* 99 Wis.2d 269, 298 N.W.2d 820 (1980), *cert. denied* 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981).

 Usually the circumstances which attend the giving of a confession or a consent are not completely agreed upon by law-enforcement officials and the accused; hence, the trial judge often must decide between conflicting evidence to form a picture in his own mind of the "totality of the circumstances." Recognizing that a trial court is in a much better position to judge the credibility of witnesses and the weight to be given their testimony, we show great deference on appeal to the trial court's determination of voluntariness by refusing to reverse its decision unless it is contrary to the manifest weight of the evidence. *Carlson, supra; Roquette, supra; State v. Thompson,* 256 N.W.2d 706 (N.D.1977). See also *Walker v. State,* 386 So.2d 762 (Ala.Cr. App.1980); *People v. Aldridge,* 37 Ill.Dec. 286, 79 Ill.2d 87, 402 N.E.2d 176 (1980); *People v. Martin,* 99 Mich.App. 570, 297 N.W.2d 718 (1980). The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance [*People v. Rodriguez,* 117 Cal.App.3d 706, 173 Cal. Rptr. 82 (1981); *State v. Baker,* 4 Kan. App.2d 340, 606 P.2d 120 (1980); *State v. Shaffer,* 96 Wis.2d 531, 292 N.W.2d 370 (1980); *State v. Hockings,* 86 Wis.2d 709, 273 N.W.2d 339 (1979); *Norwood v. State,* 74 Wis.2d 343, 246 N.W.2d 801 (1976), *cert. denied* 430 U.S. 949, 97 S.Ct. 1589, 51 L.Ed.2d 798 (1977) ], there is sufficient competent evidence fairly capable of supporting the trial court's determination. See *United States v. Valle,* 644 F.2d 374 (8th Cir.1981); *Nelson v. State,* 398 So.2d 421 (Ala.Cr.App. 1981); *People v. Traubert,* 199 Colo. 322, 608 P.2d 342 (1980); *People v. Scott,* 198 Colo. 371, 600 P.2d 68 (1979); *State v. Greene,* 91 N.M. 207, 572 P.2d 935 (1977);

*People v. Chaffee,* 55 A.D.2d 736, 389 N.Y. S.2d 168 (1976).

We now turn to an examination of the entire record to see if there is sufficient evidence to support the trial court's conclusion that Discoe's confession and consent to search were not given voluntarily.

Discoe's first contact with the police occurred in the early morning hours of March 11, 1982, when he was stopped for speeding and subsequently arrested for driving a motor vehicle while under the influence of alcohol. Before going to the police station, Discoe was taken to a local military hospital to receive treatment for a cut on his hand which he said had been inflicted by a hitchhiker in a struggle after the hitchhiker had pulled a knife on him. Following his processing at the police station for drunk driving, Discoe was released from custody on bond, but because his car had been impounded he had to hitchhike to his home at the Minot Air Force Base where he was stationed on active duty. Once at home, Discoe had something to eat, got cleaned up, and hitchhiked back to town to get his car out of the impound lot.

In the meantime, the police had investigated a complaint by Larry Stapleton that a burglary had occurred in his home sometime during the previous night in which stereo equipment and a television set were taken. Apparently the burglar had gained access to Stapleton's home by breaking a window in the entrance door.

As it turned out, Stapleton was acquainted with Discoe, who had been a guest in his home, and after discovering bloodstains on the broken glass from the entrance door and hearing that Discoe had received a cut on his hand the same night as the burglary, he surmised that Discoe might have been the burglar.

When the police learned of Stapleton's suspicions, they had a hold placed on Discoe's car. Consequently, once Discoe arrived at the impound lot to get his car, he was informed that his car could not be released without police authorization, which was being withheld. Discoe called the po-

lice to inquire why there was a hold on his car and he was told that they wanted to talk to him. Discoe stated that he had no means of getting to the police station, but the officer he was talking to said that a patrol car would be sent to give him a ride.

Prior experience of the accused with the police is a factor which has been considered in deciding the issue of voluntariness. E.g., *Barrera, supra*. It is undisputed that Discoe had no past involvement with law-enforcement officials. This circumstance is significant when taking into account that the police did not assert a lawful basis for placing a hold on Discoe's car. The police say that Discoe was simply requested to go to the police station to have a talk with them and that Discoe was not at that time told he was under arrest or could not leave; yet, Officer Nevland, who primarily questioned Discoe, testified that the hold on Discoe's car would not have been released until they had interviewed him. Thus Discoe was in the position of having to go to the police station and deal with the police before he could get his car from the impound lot.

Upon his arrival at the police station, Discoe was questioned regarding his previous statement of how his hand had been cut by a hitchhiker. Expressing disbelief in Discoe's statement, Officer Nevland informed Discoe of his constitutional rights and proceeded to question him on the subject of the burglary at Stapleton's residence. This questioning produced a different statement from Discoe: Discoe admitted knowledge of the burglary; he said he owed two men some money, and in exchange for cancellation of the debt, he took them to Stapleton's home where they, without his active participation, forcibly entered the home and removed the stereo equipment and television set.

Nevland again told Discoe he didn't believe him. The officers involved in the questioning then stated they had fingerprints and a blood sample, apparently from the broken glass, which they thought were his. Discoe testified he became panicky and gave the officers yet another statement in which he confessed burglarizing the Stapleton home and placing the stolen articles in the trunk of his car. Along with this final statement, Discoe consented to the search of his car which was conducted a short while later with Discoe's cooperation and aid. Stapleton's stereo equipment and television set were found in the trunk of Discoe's car.

In its order suppressing Discoe's confession and vitiating the consent to search his car, the trial court found from the evidence presented at the suppression hearing:

"I.

"That at the time of the interview on the morning in question, Defendant had been awake for well over 24 hours.

"II.

"That Defendant had participated in substantial drinking prior to being questioned.

"III.

"That at all times in question the Defendant was in some pain as a result of a laceration to one of his hands.

"IV.

"That the interview was conducted at the Minot Police Department in the presence of several officers, some of whom were uniformed, and although Defendant perhaps voluntarily came to the police station, he was not prepared to embark on an interview at that time, but was attempting to retrieve his vehicle.

"V.

"During this time it was apparent that the Defendant was suffering from the after-effects of drinking.

"VI.

"Defendant was tired, and his freedom was restricted by the lack of availability of a vehicle.

## "VII.

"... He was never told that he could remain or could leave, but the balance of the circumstances were such as to cause him to infer that he could not leave...."

The trial court concluded that "[the] Defendant's self-determination was critically impaired" and that "[the] Defendant was the victim of an unequal confrontation."

Although the trial court did not make a specific finding on the matter, there was conflicting evidence presented at the hearing concerning promises made by the police to Discoe prior to his signing the confession and giving the consent to search his car. Resolving the conflict in the evidence in favor of the trial court's determination of involuntariness, we find the evidence shows that the police officers interviewing Discoe promised to help get him out of the fix he was in if, in return, he would make a drug purchase for them from an individual named "Alvin" (a pseudonym). During cross-examination of Discoe the prosecuting attorney asked: "Was there any coercion for you to give the statement, Mr. Discoe?" Discoe answered: "I wouldn't have given it if they—but they were saying they would give me help; buy some drugs and stuff like that. They were promising stuff."

Officer Nevland claimed no such promises were made. However, he did admit on cross-examination that the topic of "Alvin's" involvement in drug traffic in Minot was discussed during the interview.[2]

While we realize that no one of these facts standing alone requires the trial court to conclude Discoe's confession and consent were the product of coercive police activities, when considered in combination they have a more serious impact on the trial court's determination.[3]

█ We believe that a judicious application of the standard of review we employ on appeal from a trial court's determination on the question of voluntariness requires affirmance of the trial court's decision in this case. If a standard of review which claims to give deference to rulings made by the trial court in a suppression hearing is to be more than a set of words used to disguise a de novo determination of the issues on appeal, we must be willing to affirm the decision of the trial court if there is evidence in the record to support it even though, after resolving the conflicts in the testimony to *our* satisfaction, our determination would be different from its own.[4]

---

2. Questioning of Officer Nevland by Discoe's attorney produced the following testimony of the subject of "Alvin":

"Q. Did you ever have a discussion with him about a gentleman by the name of ["Alvin"]?

"A. I don't recall the name, but he did give one—the name of a person, the first name who he stated he owed this money to. If it was ["Alvin"], I don't recall.

"Q. Did you discuss with him this person ["Alvin's"] involvement with drug traffic in Minot?

"A. It may have come up.

"Q. Did it come up?

"A. I don't recall.

"Q. Which is it? May it have? You don't recall?

"A. I am saying I don't recall if it did or not.

"Q. Could it have come up?

"A. It is very possible.

"Q. Did you discuss at all whether Mr. Discoe would help you out in any way securing drugs from this ["Alvin"]?

"A. No, I didn't.

"Q. Did anybody in your presence?

"A. No.

"Q. Did you later after he left the station on the 11th ever call him up about helping you out in relation to ["Alvin"] and drugs?

"A. No.

"Q. Are you saying that didn't happen?

"A. That didn't happen."

3. Some courts, however, have gone so far as to say that the single fact that inducements were offered to the accused to make a statement would preclude the statement's being made voluntarily. See, e.g., *State v. Sutton,* 207 Neb. 778, 301 N.W.2d 335 (1981).

4. Thus we cannot conclude that evidence of consumption of alcohol and its aftereffects was sufficient to vitiate consent in view of the evidence that Discoe was able to hitchhike back to the Minot Air Force Base, eat, get cleaned up, and hitchhike back to town *after* consuming the alcohol but before giving the confession and consenting to the search of the car. So, too, we cannot conclude that the evidence of the laceration to Discoe's hand and the pain connected therewith would, of itself, be sufficient to vitiate consent; nor do we conclude that the fact the defendant was "tired" would,

We will not completely redetermine the issue of voluntariness on appeal but, rather, we will evaluate the trial court's decision by examining the entire record to see if there is sufficient competent evidence to sustain the decision so as to ensure that it is not against the manifest weight of the evidence.

 Having performed our function in this case, we are unable to say that the trial court's determination of involuntariness is contrary to the manifest weight of the evidence. Accordingly, we affirm the trial court's order suppressing Discoe's confession and vitiating Discoe's consent to the search of his car.

ERICKSTAD, C.J., and PEDERSON and PAULSON, JJ., concur.

SAND, Justice, concurring specially.

Because of the factual situation involved in this case, I believe an explanation of my understanding of the opinion and my concurrence therein is appropriate.

The opinion, in footnote 4, states that the consumption of alcohol, which was self-induced, and its after-effect did not vitiate voluntariness of consent. The same is true regarding the pain in the hand and his state of being tired, which were the product of his own behavior. As I understand the opinion, none of the foregoing items (consumption of alcohol and aftereffect, pain in hand, and tired feeling) individually or collectively constitute grounds for vitiating the voluntariness of consent. In my opinion, these items may not be used as grounds for suppressing evidence. In this respect, paragraphs I, II, III, IV, V, and VI in the trial court's findings in regard to the suppression hearing do not constitute grounds for suppressing any of the evidence. However, the other items "unequal confrontation" and the promise of getting the defendant out of the fix if he would make a drug purchase, if believed by the court to be true, would constitute grounds for vitiating

the voluntariness, and would constitute a basis for suppressing the evidence under the current "exclusionary rule," and it is for this reason I concur in the opinion.

reviewing the trial court's decision, we have kept that in mind.

of itself, be sufficient to vitiate consent. As we recognized above, however, the trial court views the totality of the circumstances and, in