STATE of North Dakota, Plaintiff
and Appellee,

v.

Steven Robert LANGE, Defendant
and Appellant.

Crim. No. 570.

Supreme Court of North Dakota.

May 26, 1977.

Schuster, Ramlo, McGuire & Anderson, Fargo, for appellant; submitted on brief by Michael O. McGuire, Fargo.

Charles J. Gilje, State's Atty., Jamestown, for appellee.

PEDERSON, Justice.

This is an appeal by the defendant, Steven Robert Lange, from his conviction in the district court of Stutsman County of being in possession of a controlled substance with intent to deliver, in violation of § 19–03.1–23, NDCC. Ralph Grager, a codefendant at trial, was also convicted of the same charge, but has not appealed from his conviction.

This appeal presents two issues for our consideration: (1) whether the defendant was stopped and arrested and his vehicle searched without probable cause; (2) whether the trial court erred in not suppressing the controlled substance because of the State's failure to show a proper chain of custody of that evidence. We affirm.

Lange and Ralph Grager were arrested in the early evening of March 13, 1976, in Jamestown, North Dakota, by Jamestown Police Officer Roger Mayhew, who was responding to a call from the North Dakota Highway Patrol office which alerted him to a possible DWI * driver on Interstate Highway 94 proceeding toward Jamestown. Officer Mayhew spotted Lange's Pontiac within the city limits of Jamestown and stopped it after following the vehicle for five city blocks and observing it weaving in its lane of traffic.

Although Grager owned the vehicle, Lange was driving it when Officer Mayhew approached to request identification from the driver. As Lange produced his driver's license, Mayhew observed within the vehicle a small pipe in the ashtray and empty brown paper bags of the type dispensed by liquor stores.

After advising Lange of his *Miranda* rights, Mayhew asked him if he had been drinking. Lange replied that he had been drinking—about half a bottle of wine. Mayhew subsequently requested identification of the passenger, Ralph Grager, advised him of his constitutional rights and, after locking the vehicle, transported both defendants to the Jamestown police station.

* *Driving while under the influence of intoxicating liquor, Sec. 39–08–01, NDCC.*

Apparently neither Lange nor Grager were told on what charge they were being arrested.

At the police station Mayhew informed his shift commander that he did not believe the defendants were sufficiently under the influence of alcohol to warrant a DWI charge, and the decision was reached to charge Lange with possession of an open container in a motor vehicle since Lange had admitted at the police station that there was half a bottle of wine under the driver's seat of the vehicle. At this point Lange was informed of this charge. Mayhew then asked the defendants for permission to search the vehicle. After initial consent was given, defendant Grager indicated some reluctance by asking, "What if we said no?", when the intended thorough nature of the search was explained to him. When Mayhew indicated that the vehicle would be impounded and searched anyway, the defendants consented to the search.

More than thirty minutes after the arrest, the vehicle was searched by Officer Mayhew and another Jamestown police officer with both defendants present. Discovered were numerous plastic bags containing small purple pills which were later identified as lysergic acid diethylamide, a controlled substance under § 19–03.1–23, NDCC. At police headquarters Mayhew placed this evidence, along with other material seized from the vehicle, in an evidence bag, tagged and initialed it, and turned it over to Sergeant Okerlund, a Jamestown police detective, who took over the investigation at that point. Lange was then informed that the charge was changed to possession of a controlled substance with intent to deliver. After questioning the defendants, Sergeant Okerlund placed the evidence bag in an evidence locker located in the Detective Bureau office in the Police Department, and placed the key in the desk of Detective Ardel Wolff, another Jamestown police detective with whom he shared the office.

Lange and Grager were tried to a jury, both were convicted, and both were given suspended sentences. Both filed notices of appeal but only Lange perfected his appeal.

## FOURTH AMENDMENT ISSUE

Lange's initial contention is that Officer Mayhew stopped and arrested him without probable cause, and that the search of the vehicle incident to his arrest was an unreasonable search and seizure prohibited by the Fourth and Fourteenth Amendments to the United States Constitution and by Section 18 of the North Dakota Constitution. Since we are confronted here with a warrantless arrest and search, the lawfulness of the search depends upon whether it falls within one of the well-recognized and well-delineated exceptions to the warrant requirement. *State v. Matthews,* 216 N.W.2d 90 (N.D. 1974); *State v. Gagnon,* 207 N.W.2d 260 (N.D. 1973). While the State has argued persuasively that this search does come within the "consent" exception to the warrant requirement, *State v. Metzner,* 244 N.W.2d 215 (N.D. 1976), we deem it necessary to discuss the issue of probable cause for the arrest since the United States Supreme Court in *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), has indicated that the legality of the arrest may be an important factor in determining whether the defendants' consent to search was freely and voluntarily given.

Lange argues that Officer Mayhew lacked sufficient probable cause to stop and arrest him because the officer was acting merely on information he had received from the Highway Patrol office, whose ultimate source was never identified nor produced at trial so that he could be subjected to cross-examination. In support of this argument Lange cites *United States v. Robinson,* 536 F.2d 1298, 1299 (9th Cir. 1976), in which the federal district court held that "founded" suspicion or probable cause could not be based solely on receipt by the arresting officer of a radio dispatch requesting that the vehicle be stopped, without any personal knowledge of the factual foundation for the relayed message. The federal court stated:

"The fact that an officer does not have to have personal knowledge of the evidence supplying good cause for a stop before he can obey a direction to detain a person or a vehicle does not mean that the Government need not produce evidence at trial showing good cause to legitimate the detention when the legality of the stop is challenged. If the dispatcher himself had had founded suspicion, or if he had relied on information from a reliable informant who supplied him with adequate facts to establish founded suspicion, the dispatcher could properly have delegated the stopping function to Officer Holland." 536 F.2d at 1299.

■ *Robinson* is readily distinguishable from the instant case. Although the ultimate source of the message received by Officer Mayhew that a possible DWI driver was proceeding toward Jamestown on Interstate 94 was never identified, North Dakota Highway Patrolman Clinton Scott, who relayed the message to the Jamestown Police Department, was present and did testify at trial. More importantly, Officer Mayhew did not rely solely on the broadcasted message in stopping the defendants' vehicle, but did so only after following the vehicle for five blocks and personally observing the erratic driving pattern of the vehicle.

In *Whiteley v. Warden of Wyoming Penitentiary,* 401 U.S. 560, 567, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306 (1971), the United States Supreme Court stated:

"This Court has held that where the initial impetus for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not adequately be supported by the tip alone. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). But the additional information acquired by the arresting officers must in some sense be corroborative of the informer's tip that the arrestees committed the felony or, as in *Drap-*

*er* itself, were in the process of committing the felony."

■ In *State v. Gagnon,* 207 N.W.2d 260 (N.D. 1973), we held that where a vehicle and its tires were opened and searched by officers acting only on a mere suspicion that some law had been violated, the search was conducted without probable cause. This is not the situation in the instant case, in which a police officer, acting upon a radio message and his own observations of the suspect's erratic driving behavior, had reasonable cause for stopping the vehicle, after which he gained additional information which gave him reasonable cause to make the arrest.

■ Although Lange places great emphasis on the fact that his vehicle did not at any time cross the center line, we do not think a police officer who has been alerted to a possible DWI suspect and who observes the vehicle wandering in its lane of traffic need wait for the driver to commit a traffic offense or become involved in an accident before he has probable cause to stop the vehicle. In *State v. Kolb,* 239 N.W.2d 815 (N.D. 1976), we distinguished between reasonable cause sufficient to justify an officer stopping a motorist for investigation, and reasonable cause for arresting such person on a charge of driving while under the influence of intoxicating liquor. In that case we approved the holding in *Borman v. Tschida,* 171 N.W.2d 757 (N.D. 1969), that an officer had sufficient cause to stop a driver for investigation where the officer had observed the car in question veer sharply, heard the squealing of tires and, while following the vehicle, observed that the vehicle swayed back and forth on the road in the driver's own lane of traffic.

■ Officer Mayhew, in the present case, stopped the defendants' vehicle under similar circumstances. Upon approaching the vehicle to request identification, his observation of the pipe and brown paper bags inside the vehicle, his detection of the odor of alcohol, and the admission by the defendants, after *Miranda* warnings were given, that they had been drinking wine in the vehicle, constituted sufficient probable

cause for their subsequent arrest. In *State v. Kolb,* 239 N.W.2d 815, 817, *supra,* we stated:

> "We held in *Witte v. Hjelle,* 234 N.W.2d 16 (N.D. 1975), in paragraphs 3 and 4 of the syllabus:
>
> " '3. Probable cause exists when the facts and circumstances within a police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed.
>
> " '4. Probable cause is a determination dependent on the particular facts and circumstances of each case.' "

■ As stated previously, we have discussed the issue of the police officer's probable cause to stop and arrest the defendants only because of its possible relevance to the determination of the voluntariness of the defendants' subsequent consent to search the vehicle. We are persuaded that the defendants did, in fact, voluntarily and validly consent to the search.

Officer Mayhew testified that he had asked the defendants at the police station if he could search their vehicle, to which Lange replied, "We have nothing to hide. Go ahead." A moment later the defendants indicated some reluctance to allow the search, and Mayhew responded, "Well we will impound the vehicle and search it anyway." On cross-examination, when asked whether he told the defendants that even without their consent he would search their vehicle and rip it up, Officer Mayhew testified: "I don't think there was anything said about ripping it up. As far as the inventory search, I don't believe we even told them there would be an inventory search. We told them we would get a warrant and search it anyway." At this point the defendants again consented to the search.

Although Lange, in his brief, has chosen to substantially ignore the issue of his consent to the search or the issue of its voluntary nature, the State has argued these issues convincingly, and we are in agreement with the State's position that the defendants clearly consented to the search of their vehicle, and that the consent was freely and voluntarily given.

■ In *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in holding that knowledge of the right to refuse consent is not a prerequisite of voluntary consent, the United States Supreme Court stated:

> "Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

■ We do not interpret *Schneckloth* to imply that when the subject is in custody consent cannot be voluntarily given. Voluntariness is always a question to be determined from all circumstances, whether the subject is, or is not, in custody. The circumstances should be viewed as more suspect when the subject is in custody.

■ There is no suggestion that subtle methods of coercion or deception were used by Officer Mayhew to obtain the consent, or that the arresting officer asserted that he possessed a warrant when in fact he did not, which would serve to vitiate the consent. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). At most, Lange could contend that Mayhew's statement that without Lange's consent he would "impound the vehicle" or "get a warrant" and "search it anyway" was inherently coercive. This argument was rejected in *State v. Rathburn,* 195 Neb. 485, 239 N.W.2d 253, 256 (1976), where the Nebraska Supreme Court held that an officer's statement that he would obtain a search warrant was not, per se, coercive:

"In situations where the searching officer has stated that he could obtain or was in the process of getting a warrant, the courts have never found such a statement coercive per se. Rather, the courts have generally looked at the statement made by the officer to determine if it was coercive in the particular factual situation. In *United States v. Culp*, 472 F.2d 459 (8th Cir. 1973), in footnote 1, on page 461, Judge Lay lists many cases, both federal and state, to the effect that where law enforcement officers indicate only that they will attempt to obtain or are getting a warrant such a statement cannot serve to vitiate an otherwise consensual search."

█ The voluntariness of the consent to search is to be determined from the totality of the circumstances, *Schneckloth v. Bustamonte, supra,* and, in examining all of the circumstances in the instant case, we find that the consent to search the defendants' vehicle was freely and voluntarily obtained.

## CHAIN OF CUSTODY

Lange also contends that the trial court erred in not suppressing the controlled substance (LSD) because the State did not show that evidence to have been in substantially the same condition at trial as at the time of arrest. Lange's chain-of-custody argument focuses on two different time periods: the 35- to 45-minute period of time when the defendants' vehicle containing the evidence was left unattended, but locked, while the defendants were first transported to the Jamestown Police Station, and the time period between March 13, 1976 (when Sergeant Okerlund first put the evidence in the locker), and March 16, 1976, when Detective Ardel Wolff removed the evidence and gave it to Richard Olson, Special Agent with the North Dakota Bureau of Criminal Investigation, who transported it to the State Laboratory for analysis.

In support of his argument, Lange cites *Erickson v. North Dakota Workmen's Comp. Bureau,* 123 N.W.2d 292 (N.D.1963), in which this Court excluded evidence of alcoholic content of blood in a workmen's compensation proceeding where a blood sample taken from the deceased had been delivered to the hospital for analysis in an unsealed container and was placed in a laboratory refrigerator readily accessible to others. A mere recital of the foregoing facts serves to point out the distinction between *Erickson* and the instant case.

Here, custody of the evidence, after it came into his hands, passed directly from the arresting officer to Sergeant Okerlund, who placed the evidence in a locked evidence locker located in a customarily locked office within the Detective Bureau. The keys to the evidence locker were placed in the desk of Detective Wolff, who subsequently turned the evidence over to Agent Olson for laboratory analysis on March 16, 1976.

Detective Wolff testified that both he and Sergeant Okerlund had interviewed people in their office and that the locker may have been left unattended and accessible to others at various times. Detective Wolff also testified that there are approximately twelve evidence lockers in his office, each with its own set of keys, and that when he removed the evidence on the morning of March 16, he had to check several of the lockers to determine which locker contained the evidence.

█ Under these circumstances the trial court accurately designated as remote the possibility that an intruder might escape the attention of on-duty officers to make his way into a usually locked office, ascertain the correct evidence locker and, securing the appropriate set of keys from an unlocked desk, doubtless by a trial and error process, obtain entrance into a locked evidence locker, all for the purpose of tampering with or planting inculpatory evidence therein. Similarly, it was proper for the lower court to conclude that the chain of custody was not broken during the 35- to 45-minute period when the defendants' vehicle containing the controlled substance was left locked, but unattended, while the defendants were taken to the police station. The trial court properly discounted as spec-

ulation the possibility that the vehicle could have been broken into during that period, in the absence of any evidence indicating such an occurrence.

██ The Minnesota Supreme Court in *State v. Johnson,* 239 N.W.2d 239, 242 (Minn. 1976), described the "chain of custody" rule in these terms:

"The 'chain of custody' rule, requiring the prosecution to account for the whereabouts of physical evidence connected with a crime from the time of its seizure to its offer at trial, serves the dual purpose of demonstrating that (1) the evidence offered is the same as that seized, and (2) it is in substantially the same condition. It insures that the items seized have not been exchanged for others more incriminating, and that they have not been contaminated or altered. [Citations omitted.]

"There can be no rigid formulation of what showing is necessary in order for a particular item of evidence to be admissible. Rather, admissibility must be left to the sound discretion of the trial judge. [Citations omitted.] He must be satisfied that, in all reasonable probability, the item offered is the same as the item seized and is substantially unchanged in condition. [Citations omitted.]

"Admissibility should not depend on the prosecution negativing all possibility of tampering or substitution, but rather only that it is reasonably probable that tampering or substitution did not occur. Contrary speculation may well affect the weight of the evidence accorded it by the factfinder but does not affect its admissibility. [Citations omitted.]"

██ The admission or exclusion of demonstrative evidence is addressed to the sound discretion of the trial court. *Gleson v. Thompson,* 154 N.W.2d 780 (N.D. 1967). We are satisfied that the trial court did not abuse its discretion in this instance.

Judgment affirmed.

ERICKSTAD, C. J., and SAND, VOGEL and PAULSON, JJ., concur.