STATE of North Dakota, Plaintiff and Appellant,

v.

John Arthur LARSON, Defendant and Appellee.

STATE OF North Dakota, Plaintiff and Appellant,

v.

Roger Charles JOHNSEN, Defendant and Appellee.

Cr. Nos. 951, 952.

Supreme Court of North Dakota.

Jan. 13, 1984.

Walter M. Lipp, State's Atty., McClusky, for plaintiff and appellant.

Baer & Asbridge, Bismarck, for defendants and appellees; argued by Darold A. Asbridge, Bismarck.

SAND, Justice.

The Sheridan County justice court granted a motion suppressing evidence against the defendants, John A. Larson (Larson) and Roger C. Johnsen (Johnsen), in a prosecution for alleged violation of North Dakota game laws. The State appealed.

On 2 October 1982 Johnsen, his two sons, Larson, his two sons, and a friend, were waterfowl hunting from a camp on Larson's land in Sheridan County. Unbeknown to Larson and Johnsen, state and federal game wardens were watching them from nearby hills from early morning until late afternoon. David Kraft, a special agent for the United States Fish and Wildlife Service, kept a log of events as the wardens watched. Kraft's log indicated that he saw the hunters shoot eighteen to twenty ducks and that the ducks were taken to several locations, a trailer house, a vehicle, an outhouse, an abandoned shed, and some brush near the shed. According to Kraft, Johnsen and his son left the camp in Johnsen's vehicle about 4:00 p.m.

Greg Cleveland, a friend of Larson, arrived at the camp with two more hunters about 5:00 p.m. Shortly thereafter, North Dakota game warden Tim Larson, and special agent Terry Grosz of the United States Fish and Wildlife Service, entered the camp. Grosz questioned the hunters and checked their licenses and guns. Grosz gave no *Miranda* warnings to Larson at that time nor at any time during the investigation.

Meanwhile, warden Larson, who was in radio contact with other wardens from the surveillance point, began a search of the brush area near the shed. When warden Larson returned from his search he reported to Grosz that he did not find any of the ducks. According to Cleveland, Grosz then said to defendant Larson, "We have spotters on the hillside, before daylight they saw you got more birds stashed down here. I will give you one chance and one chance only to show me or we will bring down six wardens and four dogs."[1] Larson then took Grosz to several locations where the ducks had been placed. Meanwhile, two more wardens joined wardens Grosz and Larson at the camp. Because Grosz apparently did not want to involve the children, he advised Cleveland to take the children "far away" and to "come back after dark." After Cleveland and the children had left, Grosz began to question defendant Larson about who had shot which ducks. Larson admitted to Grosz that he shot twelve ducks, seven more than permitted by law. Grosz then confiscated Larson's shotgun.

The wardens were at the camp for about two and one-half hours. When they left, they met Johnsen coming toward the camp in his pickup. Kraft explained to Johnsen that they had talked to Larson and that they "[knew] what had happened." Kraft showed the confiscated ducks to Johnsen and asked him to identify which ones he had shot. Johnsen admitted that he shot more than his limit. The wardens then confiscated Johnsen's gun and told him he could return to the camp.

---

1. Warden Larson agreed that Grosz made the statement to defendant Larson. However, warden Larson testified that he thought Grosz said five wardens.

On 5 October 1982 separate complaints were filed against Larson and Johnsen and warrants were issued for their arrests. The complaints charged that Larson had shot seven ducks more than his limit, and that Johnsen had shot three more than his limit.

Larson and Johnsen moved to suppress all of the evidence and their statements on the grounds that the search was conducted in violation of their fourth amendment protection against unreasonable searches and seizures and that their statements were given in violation of their fifth amendment privilege against compelled self-incrimination.[2]

The Sheridan County court held an evidentiary hearing in which the two complaints were consolidated. The court suppressed all of the evidence and the defendants' statements on the grounds that their fourth and fifth amendment rights had been violated, and the State appealed.

■ With respect to the State's contention that no fourth amendment violation occurred, we begin by noting that, ordinarily, all searches made without a valid search warrant are unreasonable unless they are shown to come within one of the exceptions to the rule that a search must be made upon a valid warrant. *Stoner v. California*, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856, 859 (1964).

The State contended that a search warrant was unnecessary because the surveillance and subsequent search of the camp was conducted pursuant to the "open fields" doctrine announced in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In *Hester* the Court said that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects' is not extended to the open fields." 265 U.S. at 59, 44 S.Ct. at 446, 68 L.Ed. at 900. Thus, the Court drew a distinction between the dwelling and its curtilage, which was protected, and an open field, which was not.

See W. Ringel, *Searches and Seizures, Arrests and Confessions,* § 8.4 (1983). Although the open fields/curtilage distinction is not easily drawn, most courts and commentators have defined curtilage as that area near a dwelling, not necessarily enclosed, that generally includes buildings or other adjuncts used for domestic purposes. *State v. Vicars,* 207 Neb. 325, 299 N.W.2d 421, 425 (1980); W. LaFave, *Search and Seizure* § 2.4, at 332 (1978).

The utility of the open fields doctrine, however, has become suspect in light of the Supreme Court's holding in *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967), that the fourth amendment protects people, not places. Thus, a greater emphasis is now placed upon an examination of whether or not one possesses a reasonable expectation of privacy in the object or area to be searched. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 899 (1968); *State v. Matthews,* 216 N.W.2d 90, 103 (N.D.1974). Nevertheless, this Court has not completely abandoned pre-*Katz* concepts, like the open fields doctrine, because such concepts are still important in determining whether or not the person searched had a reasonable expectation of privacy. See *State v. Planz,* 304 N.W.2d 74, 79 (N.D.1981). Indeed, the United States Supreme Court has said that it "has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by [the fourth] Amendment." *Rakas v. Illinois,* 439 U.S. 128, 144, 99 S.Ct. 421, 431, 58 L.Ed.2d 387, 401 n. 12 (1978). The Court has also recently referred to the open fields doctrine in determining that a defendant's expectation of privacy with respect to activities inside his cabin did not extend to police observation of a car carrying a container with an electronic beeper inside it as it arrived on defendant's property after leaving a public highway. *United States v. Knotts,* 460 U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55

---

2. The fourth and fifth amendments are applicable to the states by virtue of the fourteenth amendment to the United States Constitution.

*Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Malloy v. Hagan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**364**

(1983). See also *Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 44 L.Ed.2d 607 (1974) (application of open fields doctrine to warrantless entry by health inspector on defendant's outdoor premises).

In the instant case, the wardens were watching the defendants from surrounding hills about one-quarter to one-half mile away. The record does not indicate whether or not the wardens were on defendant Larson's property, although warden Kraft testified that the wardens were on "[what was] known to [Kraft] as the John Larson Hunting Camp, Sheridan County." If the wardens were in fact on Larson's property, the record does not reflect whether or not the camp was also visible from other property, such as a public road or neighboring land.

Kraft testified that the camp was located "kind of in a pasture" between two large sloughs. The camp contained a trailer house, an outhouse, and a dilapidated shed located about thirty feet from the trailer house. The record does not indicate for what purposes, or how often, the buildings were used. The record does indicate that Larson's land was posted, although it does not indicate how many signs there were or where the signs were located. Johnsen testified that one had to drive through a stubble-field to get to the camp, but the record does not indicate whether or not the area was fenced, or whether or not any gates had to be opened.

Many of the unknown factors noted above, while not individually dispositive, would be cumulatively significant in applying the open fields doctrine to determine whether or not the defendants had a reasonable expectation of privacy.[3] Because of the nature of the disposition of this case, however, we need not resolve that question. The fact remains that warden Larson's initial search of the area near the

shed was unproductive. The wardens did not discover the ducks until defendant Larson led them to the ducks following Grosz' statement that he was prepared to dispatch dogs and more wardens.

 The State argued, in the alternative,[4] that if the open fields doctrine was inapplicable, then Larson voluntarily consented to the search that produced the ducks. In cases involving the voluntariness of a confession or a consent to search, this Court will not reverse the trial court's determination unless it is contrary to the manifest weight of the evidence. The trial court's determination will not be overturned if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's determination. *State v. Discoe*, 334 N.W.2d 466, 469 (N.D.1983).

 A determination of whether a consent to a search was voluntary or involuntary is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 862 (1973); *State v. Lange*, 255 N.W.2d 59, 64 (N.D.1977). To be voluntary, the consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth, supra*, 412 U.S. at 228, 93 S.Ct. at 2048, 36 L.Ed.2d at 863; see also *State v. Metzner*, 244 N.W.2d 215, 222–23 (N.D.1976).

 The most critical fact in the case at bar is Grosz' statement to defendant Larson that if Larson did not show Grosz where the ducks were, then Grosz would "bring [in] six wardens and four dogs." Grosz' statement was an implicit, if not explicit, threat that the wardens did not intend to leave until the ducks had been found. The implication was that defendant

---

**3.** Although the trial judge concluded that the camp fell "well within the ... open field doctrine," we are not prepared to say that it did.

**4.** The State also argued, in the alternative, that the inevitable discovery doctrine applied. Giv-

en the facts of the case, however, particularly the fact that the wardens' initial search was unproductive, we find the argument meritless and unworthy of discussion.

Larson had no other alternative than to submit to a search and that the wardens had authority to wait "until hell froze over" for his reply. Threats of force or authority of the type made by Grosz constitute impermissible ultimatums, ultimatums abhorrent to the principles of the fourth amendment.

In *Schneckloth, supra,* 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863, the Court held that a defendant's knowledge of the right to refuse consent is one factor in determining whether or not the consent was voluntary, but the State need not demonstrate such knowledge as a prerequisite to establishing a voluntary consent. Although the record does not specifically indicate whether defendant Larson knew or did not know of his right to refuse consent, it does appear that, under the circumstances, Larson believed he could not refuse. Larson testified that he showed Grosz where the ducks were because "[he] wasn't going to fool around with [Grosz]."

There were additional factors which indicate that defendant Larson's consent may have been involuntary. Despite over two hours of questioning by wardens Grosz and Larson, defendant Larson gave no indication that he intended to consent to a search until Grosz threatened a more intensive search. Grosz' suggestion to Cleveland that he and the children should leave and go "far away" indicates that Grosz' threat was not frivolous. When Cleveland and the children left, defendant Larson was left by himself to confront the four wardens. The investigation, by the time Grosz made his threat, was not routine and the questions were not general. Finally, we note that Grosz was 6' 5" tall and weighed about 280 pounds. Although the physical stature of a police officer alone is not dispositive of whether or not a consent to a search was voluntary, it may, under some circumstances, have an intimidating effect.

The State argued that our decision in *State v. Lange,* 255 N.W.2d 59 (N.D.1977) should apply. In *Lange,* a police officer stopped the defendant's car after the officer observed the car weaving across a city street. When the officer approached the car he noticed a small pipe in the ashtray and several empty paper bags. The officer read Lange his *Miranda* rights and asked him some questions. When Lange admitted that he had been drinking, the officer took him to the police station. At the station, the officer asked Lange for permission to search his vehicle. Lange initially consented, but after the thorough nature of the search was explained, Lange's companion in the car asked, "What if we said no?" When the officer replied that the vehicle would be impounded and searched anyway, Lange consented to the search. When the car was searched, police officers found several controlled substances. On appeal Lange argued that his consent was involuntary.

In upholding the search in *Lange,* we said that the officer did not even use any subtle methods of coercion or deception to obtain the consent. We further held that an officer's claim that he could obtain a warrant was not, per se, coercive.

The facts in *Lange* are easily distinguished from those in the instant case. In this case the wardens did not ask permission to search. Furthermore, the wardens never mentioned the word warrant, much less claim that they could obtain one. The wardens gave no explanation to defendant Larson of his rights, nor did they give him his *Miranda* warnings.

We believe that, considering the totality of the circumstances, defendant Larson's consent to a search of the premises was involuntary.

■ Larson not only "consented" to the search, he also led the wardens to the places where the ducks had been placed. At the suppression hearing, the defendants argued, and the trial court agreed, that the defendants' fifth amendment privilege against compelled self-incrimination was violated because the defendants were entitled to *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On appeal the State argued that no fifth amendment violation occurred because the questioning was more

like a "noncustodial interview" within the meaning of *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

*Miranda* defined custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda, supra*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. In *Beckwith* the court rejected any extension of *Miranda* to situations involving noncustodial circumstances in which a police investigation has focused on the suspect. *Beckwith, supra*, 425 U.S. at 345, 96 S.Ct. at 1615, 48 L.Ed.2d at 6–7; see also *State v. Fields*, 294 N.W.2d 404, 407–08 (N.D.1980) (adoption of "custody" test for application of *Miranda;* "focus" language of *State v. Iverson*, 187 N.W.2d 1 (N.D.1971), *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971), limited to context of *Iverson* ).

Neither Larson nor Johnsen were formally placed under arrest. Further, although the defendants disputed the fact, wardens Kraft and Larson testified that the defendants were free to leave during the questioning. While we view the wardens' assertions with skepticism, we are not prepared to conclude, as the trial court did, that the defendants were in custody within the meaning of *Miranda*. Nevertheless, the issue of voluntariness is always a question to be determined from all of the circumstances, regardless of whether or not a subject is in custody. *State v. Lange*, 255 N.W.2d 59, 64 (N.D.1977).

In *Beckwith* the court recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of ... law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined ....' " *Beckwith, supra*, 425 U.S. at 347–48, 96 S.Ct. at 1617, 48 L.Ed.2d at 8. The Court

went on to say that "When such a claim is raised, it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' " *Beckwith, supra*, 425 U.S. at 348, 96 S.Ct. at 1617, 48 L.Ed.2d at 8. The Court added that "Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive." *Beckwith, supra*, 425 U.S. at 348, 96 S.Ct. at 1617, 48 L.Ed.2d at 8.

Neither Larson nor Johnsen received either *Miranda* warnings or anything similar to them.[5] Moreover, the defendants were faced with Grosz' threat to use dogs and more wardens in an attempt to find the birds if Larson did not cooperate with him. The interrogation and intimidation by the officers in this case was such that the wardens should have known it would likely elicit an incriminating response from the defendants. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980).

Viewing the totality of the circumstances in this case we conclude that the trial court's determination regarding the voluntariness of Larson's consent to search and the defendants' subsequent confessions, is not against the manifest weight of the evidence. Accordingly, we affirm the trial court's order suppressing Larson's consent to the search and Larson and Johnsen's confessions.

ERICKSTAD, C.J., and GIERKE, PEDERSON and VANDE WALLE, JJ., concur.

---

5. Although the defendant in *Beckwith* was not given a literal reading of the *Miranda* warnings, he was advised of his right against compelled self-incrimination, and his right to seek the assistance of an attorney before responding. *Beckwith, supra*, 425 U.S. at 348–49, 95 S.Ct. at 1617, 48 L.Ed.2d at 8.