STATE of North Dakota, Plaintiff
and Appellee,

v.

Charles P. VandeHOVEN, Defendant
and Appellant.

Crim. Nos. 1152, 1153.

Supreme Court of North Dakota.

June 6, 1986.

Fabian E. Noack, Carrington, for plaintiff and appellee.

James A. Wright, of Hjellum, Weiss, Nerison, Jukkala, Wright & Paulson, Jamestown, for defendant and appellant.

VANDE WALLE, Justice.

Charles VandeHoven appealed from an order by the County Court of Foster County denying suppression of a blood sample and the judgments of conviction for driving while under the influence of alcohol and for possession of alcoholic beverage by a person under the age of twenty-one. We affirm.

On the evening of January 25, 1985, VandeHoven, who was nineteen years old at that time, was traveling northbound on a paved county road which did not have a center line. Officers Grosgebauer and Schulz, members of the North Dakota State Highway Patrol, were traveling southbound on the same road. As the two vehicles approached each other, VandeHoven's vehicle veered sharply to his right, and then sharply back to the left, crossing over the unmarked center of the roadway.

According to Grosgebauer, the vehicle turned abruptly enough to shine the headlights beyond the fence line and "out across the field to the west side of the roadway." Grosgebauer turned the patrol car around and followed VandeHoven for approximately four-tenths of a mile, at which time he stopped VandeHoven. Grosgebauer testified that while he followed the vehicle, and before he signaled him to stop, VandeHoven drove substantially below the speed limit (about 40 miles per hour in a 55) although his driving "was good as far as staying in his own lane."

VandeHoven explained to Grosgebauer that the erratic movement of his vehicle was the result of his dropping something. During their discussion Grosgebauer noticed a moderate but distinct odor of an alcoholic beverage coming from VandeHoven's breath. After conducting several field sobriety tests on VandeHoven, Grosgebauer placed VandeHoven under arrest for driving while under the influence of alcohol. Grosgebauer also seized a quantity of beer which was in plain view. VandeHoven was later charged for possession of alcohol by a minor.

Prior to trial VandeHoven filed a motion to suppress all evidence obtained as a result of the stop of his vehicle, arguing that there was no probable cause to stop or to arrest VandeHoven. Pursuant to a stipulation entered into by the parties, the hearing on the motion to suppress and the trial itself were held at the same time. The court denied the motion to suppress, holding that Grosgebauer had probable cause to stop VandeHoven and probable cause to make the arrest as to both charges. In addition, the court found VandeHoven guilty of those charges.

VandeHoven raises three issues on appeal:

(1) whether there was sufficient "probable cause" to stop him;

(2) whether the blood-alcohol test was shown to have been fairly administered; and

(3) whether the six-month delay between the trial and the court's decision deprived him of his right to a speedy trial and right to due process of law.

I

■ As we recently said in *State v. Placek*, 386 N.W.2d 36, 37 (N.D.1986),

"[t]he law governing investigative stops of automobiles is clear: an officer must have an *articulable and reasonable suspicion* that a motorist is violating the law in order to legally stop a vehicle. *State v. Indvick*, 382 N.W.2d 623 (N.D. 1986); *State v. Dorendorf*, 359 N.W.2d 115 (N.D.1984)." [Emphasis added.] [1]

We employ an objective standard in the determination of the validity of a stop, taking into account inferences and deductions that an investigating officer would make that may elude laypersons. *Indvick, supra*.

"The question is whether or not a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant committed or was committing an offense, a stop of a person or vehicle requires only *suspicion* that a law has been violated or is being violated. Cf. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) [probable-cause standard] with *Delaware v. Prouse, supra* [reasonable-suspicion standard]. However, this suspicion must be "articulable and reasonable." The articulable aspect requires that the stop be justified with more than just a vague "hunch" or other non-objective facts; and the reasonable aspect means that the articulable facts must produce, by reasonable inference, a *reasonable* suspicion of unlawful conduct. See, e.g., *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1964).

1. The parties mistakenly focus on whether there was "probable cause to stop" VandeHoven. Although this Court, on occasion and generally before the United States Supreme Court's decision of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), has used the phrase "probable cause to stop" [e.g., *State v. Dorendorf*, 359 N.W.2d 115 (N.D.1984) ], our discussion below demonstrates that the better form of analysis employs the reasonable suspicion standard in regard to the stopping of a person or vehicle. See also *State v. Placek*, 386 N.W.2d 36 (N.D.1986). Probable cause is a much more exacting standard. Unlike the probable cause standard where it is necessary that a prudent person *believe* that the suspect had

was, or was about to be, engaged in criminal activity." *Indvick*, 382 N.W.2d at 627.

VandeHoven argues that the initial erratic movement, or weaving, was not sufficient to justify a stop. We disagree. Perhaps VandeHoven's observed behavior is not so cumulative as the behavior that justified the stopping of the vehicles in *Dorendorf* [initial weaving, subsequent weaving], *State v. Lange*, 255 N.W.2d 59 (N.D.1977) [officers responding to report of unidentified DWI suspect, weaving], *State v. Kolb*, 239 N.W.2d 815 (N.D.1976) [slight weaving, extreme fluctuations in speed, veering onto shoulder of road, crossing over center line], or *Borman v. Tschida*, 171 N.W.2d 757 (N.D.1969) [sharp veering in one direction, squealing of tires, weaving within own lane]. Although there may be situations where slight weaving cannot serve as a basis for a valid stop,[2] the erratic movement of the vehicle in this case provided sufficient basis to create an articulable and reasonable suspicion that VandeHoven was violating the law. See *Dorendorf, supra*.[3]

■ VandeHoven further argues that his subsequent non-suspicious behavior dispelled any reasonable suspicion that he was violating the law, thereby invalidating the stop. We do not agree. Once a reasonable suspicion has been formed, subsequent actions which do not enhance the suspicion are irrelevant to a reasonably prompt stop of a vehicle.

## II

■ VandeHoven next argues that the prosecution failed to show that the blood test was fairly administered. VandeHoven quotes *State v. Salhus*, 220 N.W.2d 852, 857 (N.D.1974), for the proposition that "the State must provide 'full proof that the equipment was in proper order, the opera-

tor was qualified, and the test given properly.'" But as we stated in *State v. Erickson*, 241 N.W.2d 854, 865 (N.D.1976), *Salhus* applies "only to laymen operating alcohol detection devices, and not to 'experts.'" In this case the blood was extracted by a registered nurse (at the request of a law enforcement officer in accordance with § 39–20–02, N.D.C.C.) and tested by an employee of the State Toxicologist. As such, the requirement delineated in *Salhus* does not apply. The disputable presumption of regularity pursuant to § 31–11–03(15), N.D.C.C., applies to the official acts of the State Toxicologist; and because no evidence that would contradict this presumption was introduced, the presumption stands. *Erickson, supra*.

■ VandeHoven also argues that pursuant to § 39–20–07(6) (1983) (since amended but applicable here), the method, equipment, and persons used by the State Toxicologist to perform the blood test must be approved by the State Toxicologist and that such approval must be filed with the clerk of the district court in each County. This is an incorrect reading of that subsection. Subsection 6 is directed to *field* inspectors of *breath* -testing equipment and its operation, not to expert, laboratory blood testing. However, at oral argument we were informed that the machines used by the State Toxicologist are included in the certification that is submitted under subsection 7 (since amended) and on file at the clerk's office of each district court. We nonetheless consider that the certification submitted under Dr. Rau's signature is sufficient certification that the method, equipment, and person operating that particular test are approved by the State Toxicologist.

Unlike *Schirado v. North Dakota State Highway Com'r*, 382 N.W.2d 391 (N.D.

---

2. See, e.g., *Warrick v. Commissioner of Public Safety*, 374 N.W.2d 585 (Minn.App.1985).

3. See also *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) [implicitly sanctioning a stop where officer observed vehicle weaving and followed the vehicle for two miles without observing any further suspicious activity]; *People v. Paez Perez*, 175 Cal.App.3d

Supp. 8, 221 Cal.Rptr. 776 (1985) [pronounced weaving of automobile in lane provides officer with reasonable cause to stop vehicle if such weaving continues for a substantial distance]; *State v. Engholm*, 290 N.W.2d 780 (Minn.1980) [continued slower than normal speed and weaving constituted reasonable suspicion].

860

1986) [failure to follow State Toxicologist's Approved Method for administering Intoxilyzer test after printing malfunction] and *Moser v. North Dakota State Highway Com'r*, 369 N.W.2d 650 (N.D.1985) [failure to start Breathalyzer test at zero] which involved deviation of the procedure employed concerning the actual taking of the test that potentially affected the substantive test results and thus the fair administration of the test pursuant to subsection 5, this case involves the alleged deviation of procedures employed subsequent to the test concerning the formal certification of the method, equipment, and persons conducting tests in the State Toxicologist's office.

 Lastly, VandeHoven argues that according to § 39–20–07(8) (1983) (since amended), "the analytical report of the blood analysis is required to be signed by the state toxicologist." Although the State Toxicologist certified the copy of the report, the report itself was signed by the employee of the State Toxicologist who conducted the test of the blood. We agree with the State that the Legislature intended to allow the State Toxicologist to delegate authority to run the tests and that his certification of the copy is sufficient to comply with § 39–20–07(8) (1983).

### III

 VandeHoven's final argument is that the delay between the trial and the lower court's decision—a delay of six months—deprived him of a speedy trial and due process. In support of this view, VandeHoven relies on Article I, Section 12, of the North Dakota Constitution, which provides:

> "In criminal prosecutions in any court whatever, the party accused shall have the right to a speedy and public trial; ... No person shall ... be deprived of life, liberty or property without due process of law."

By the plain terms of Section 12, the right to a speedy trial involves the time-period from the formal accusation to the trial, and not the time between the trial and the decision. Although there may be instances where such a delay causes a recognized constitutional wrong, such is not the case here. VandeHoven's trial occurred two months after issuance of the citations. Before making its decision, the trial court reviewed its trial notes and the record, which included the taped transcript. In a letter to counsel, the trial court reviewed the evidence upon which it relied in making the decision and explained the conclusions that it derived from that evidence.[4] VandeHoven does not contend that the evidence fails to support his conviction; and such a contention would be without merit. We therefore fail to perceive any prejudice by the delay. Nor has any prejudice been shown.

The judgments are affirmed.

ERICKSTAD, C.J., and GIERKE, MESCHKE and LEVINE, JJ., concur.

---

4.   The lower court also offered its trial notes for   review by counsel.