**CITY OF GRAFTON, Plaintiff and Appellee,**

v.

**Robert G. SWANSON, Defendant and Appellant.**

**Cr. No. 920331.**

Supreme Court of North Dakota.

March 11, 1993.

Steven C. Ekman, City Atty., Grafton, for plaintiff and appellee; submitted on briefs.

Robert J. Woods of Woods Legal Services, Forest River, for defendant and appellant.

VANDE WALLE, Chief Justice.

Robert G. Swanson appealed from a judgment of conviction entered after a guilty verdict. On appeal, he challenges the county court order which denied his motion to suppress evidence in an action by

the City of Grafton against him for driving while under the influence of alcohol. We affirm.

At about 3:20 p.m. on March 19, 1992, Officer Joel D. Scharf of the City of Grafton Police Department was directed by a dispatcher at the Grafton Law Enforcement Center to investigate a complaint regarding a domestic disturbance at a residence in the City of Grafton. The dispatcher informed Officer Scharf that Swanson had just "squealed" out of the residence's driveway, was intoxicated, and had done vandalism to a vehicle belonging to the complainant, Linda Ratliffe.

Officer Scharf immediately drove to the address and spoke to Ratliffe about her complaint. Ratliffe, appearing very upset, told Officer Scharf that she and Swanson had an argument, after which he left the house, vandalized her vehicle, and drove rapidly away from the driveway, leaving skidmarks on the driveway pavement. Swanson was also alleged to be very intoxicated. Ratliffe told Officer Scharf that she, not Swanson, owned the house, and that she did not want Swanson to return to the premises.

In an attempt to resolve the situation and avoid another altercation between the two, Officer Scharf sought out Swanson. At about 3:45 p.m., or about 20 minutes after Officer Scharf left Ratliffe's home, he came upon a local bar in Grafton where a vehicle matching Ratliffe's description of Swanson's car was parked. Officer Scharf entered the bar and located Swanson. Although Officer Scharf did not observe Swanson consume alcohol, he did detect a heavy odor of alcohol on Swanson's breath and noticed Swanson's slurred speech and staggered walk. He did not require Swanson to submit to a sobriety test or submit to a preliminary breath test, but Officer Scharf was nonetheless of the opinion that Swanson was blatantly intoxicated. Officer Scharf left the bar after warning Swanson to refrain from driving that evening.

At about 7:46 p.m., or about four hours after he left Swanson at the bar, Officer Scharf observed Swanson driving in the neighborhood of Ratliffe's residence. He followed Swanson for one-half block, at which point Swanson turned into the driveway of Ratliffe's house. Officer Scharf noticed no unusual driving or traffic violations while he observed Swanson driving.

As Swanson drove into Ratliffe's driveway, Officer Scharf parked his patrol vehicle in the street, behind and perpendicular to Swanson's vehicle parked in the driveway. Officer Scharf and Swanson exited their vehicles at about the same time, and Swanson began walking toward the house. Officer Scharf yelled out Swanson's name after noticing his staggered and swaying walk. Swanson stopped, and Officer Scharf came within 18 to 24 inches of Swanson. Detecting glassy eyes, slurred speech, and a very heavy, strong odor of alcohol on Swanson's breath, Officer Scharf informed Swanson of his belief that Swanson had been driving while intoxicated. Officer Scharf requested Swanson to take some field sobriety tests, but he refused and attempted to push Officer Scharf aside to enter Ratliffe's residence. Officer Scharf physically restrained Swanson and subsequently arrested him for driving while under the influence of alcohol.

Swanson filed a motion to suppress evidence alleging that Officer Scharf's stop was illegal because Officer Scharf lacked a reasonable and articulable suspicion to believe that Swanson was engaged in criminal activity. After a hearing in Walsh County Court, the court issued a memorandum decision and order denying the motion.

■ Our standard of review in considering a trial court's disposition of a motion to suppress is that its disposition will not be reversed if, after the conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's determination. *State v. Sarhegyi*, 492 N.W.2d 284 (N.D.1992); *State v. Bryl*, 477 N.W.2d 814 (N.D.1991). This standard recognizes the trial court's opportunity to weigh the credibility of the witness and the testimony presented. *Sarhegyi, supra.*

The trial court held that the stop occurred when Officer Scharf physically restrained Swanson and requested him to

submit to field sobriety tests. There is no doubt that if the stop occurred at this point, the stop was valid. The record is replete with testimony which would give a law enforcement officer a reasonable and articulable suspicion to stop Swanson for driving while intoxicated after he exited his vehicle and exhibited signs of intoxication.[1]

■ Swanson contends that the crux of this appeal involves the question as to when a "stop" occurred—when Officer Scharf parked behind Swanson thus preventing Swanson from moving his vehicle, or when Officer Scharf physically restrained Swanson and requested his submission to field sobriety tests. Swanson argues that the stop occurred when Officer Scharf parked behind him. If the stop occurred at that point, he alleges that Officer Scharf's stop was illegal because he observed no erratic driving or traffic infractions that would warrant a stop. In other words, he lacked an articulable and reasonable suspicion that a crime was afoot.

However, we believe it is immaterial whether the stop occurred when Officer Scharf blocked the driveway, as Swanson contends, or whether it occurred when Officer Scharf stopped Swanson after he was out of the car. In either event, Officer Scharf justified the stop.

The record shows that one of Officer Scharf's justifications for stopping Swanson was his concern that domestic violence was about to happen.[2] The imminent likelihood of domestic violence in this instance is sufficient to justify the stop for the purpose of warning Swanson not to enter the house.

Incidents of domestic violence occur against women in the United States at epidemic rates—up to 60% of all married women suffer physical abuse at the hands of their spouses at some time during their marriage, and the same can be said of unmarried cohabitants.[3] As "on the scene" enforcers of domestic-violence laws, police and law enforcement officials play a principal role in protecting battered women. Ineffective police response is a chief reason for continuing high rates of domestic violence. Police are under increasing pressure to take a more active role in preventing domestic violence,[4] and a failure to do so has prompted calls for increased police liability for failure to respond to such incidents.[5] Clearly, incidents or the likelihood of incidents of domestic violence are a valid concern of police and they should take steps to try to prevent their occurrence.

1. Officer Scharf's testimony regarding what transpired after he and Swanson exited their vehicles while in Ratliffe's driveway included:
    "Q. Did you see Mr. Swanson get out of his vehicle when he stopped it in the driveway at this house?
    "A. Yes ma'am, I did.
    "Q. What if anything, did you notice about his ability to walk?
    "A. His walk again, was staggered, and he appeared to me to be very much impaired.
    *   *   *   *   *   *
    "Q. What kind of odor did you detect?
    "A. Once again, there was a very heavy odor of alcoholic beverage.
    "Q. What did you notice about his eyes?
    "A. They were glassy eyes, and a very much slurred speech."

2. Testimony was elucidated as follows regarding Officer Scharf's stop justification with regard to possible domestic violence:
    "Q. Officer, were there any other reasons that you were attempting to prevent him from going into the house?
    "A. Besides my belief that a DUI offense had taken place, I also foresaw another domestic disturbance taking place considering the state he was in, and the state that—if he had gotten back into the house."

3. Diane Klein, *Domestic Violence Isn't Tame—It's Wild, Ugly Crime*, Los Angeles Times, February 9, 1992, at E1 (quoting United States Surgeon General Antonia Novella who notes that every five years domestic violence claims as many lives as did the Vietnam War). In a speech recently given by Chief Justice Keith of the Minnesota Supreme Court, the Chief Justice noted that there are over 63,000 incidents of domestic violence in Minnesota each year which result in twenty-seven murders. Chief Justice A.M. "Sandy" Keith, *Domestic Violence and the Court System*, 15 Hamline L.Rev. 105 (1991).

4. Randall D. Armentrout, *Car 54 Where Are You?: Police Response to Domestic Violence Calls*, 40 Drake L.Rev. 361 (1991).

5. *E.g.,* Sue Ellen Schuerman, *Establishing a Tort Duty for Police Failure to Respond to Domestic Violence*, 34 Ariz.L.Rev. 355 (1992).

Approximately four hours earlier, Officer Scharf was called to Ratliffe's residence for the purpose of investigating a potential domestic violence situation. He was told that Ratliffe and Swanson had an argument, that Swanson had done some property damage, that Swanson was drunk, and that Ratliffe did not want Swanson to return to her property. When Officer Scharf observed Swanson returning to Ratliffe's residence, he was justified in stopping Swanson since he had a reasonable and articulable suspicion that a crime—domestic violence or trespassing—was about to occur. The likelihood of domestic violence, after a police officer has knowledge of its recent occurrence and the alleged offender's contemporaneous return to the scene after having been observed earlier in the day in an intoxicated state, prompts a valid and reasonable suspicion of the possibility that a crime is about to happen, allowing a stop of the alleged offender.

■ Officer Scharf also testified that one of his justifications for stopping Swanson was his belief that Swanson was driving under the influence of alcohol.[6] When Officer Scharf was parked near Ratliffe's home, he noticed Swanson driving his car for about one block. He did not observe any traffic violations or otherwise unusual driving on the part of Swanson. Officer Scharf then followed Swanson for one-half block before Swanson pulled into Ratliffe's driveway. Again, Officer Scharf noticed no traffic violations or unusual driving. Nonetheless, we recognize that Officer Scharf had a reasonable and articulable suspicion that a crime—driving while under the influence of alcohol—was being committed.

A common rule of evidence is that the prior existence of a fact, such as a state of health or being, is evidence of the continuation or later existence of that fact. As John Wigmore states:

"When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later period.*"

2 John Henry Wigmore, *Evidence in Trials at Common Law*, § 437 (1979). *See also* Rule 301 NDREv; NDCC § 31–11–03(31); 1 Spencer A. Gard, *Jones on Evidence*, § 3:82 (1972).[7]

Officer Scharf had contact with Swanson in a Grafton bar four hours prior to his stop and gave ample testimony regarding his opinion of Swanson's blatant state of intoxication.[8] When Officer Scharf's ob-

---

6. Testimony was elicited as follows regarding Officer Scharf's stop justification with regard to driving while intoxicated:
   "A. At that point I exited my patrol car and made contact with Mr. Swanson.
   "Q. How did you make contact with him, please explain that?
   "A. I walked up to him, and spoke to him.
   "Q. Okay, what did you say to him?
   "A. I don't recall the exact words, it was—it was to the extent that he had—had driven intoxicated.
              *    *    *    *    *    *
   "Q. You did see a traffic violation, right?
   "A. I had—
   "Q. You're hesitating, yes or no?
   "A. I had a suspicion that a traffic violation was being committed, yes sir.
              *    *    *    *    *    *
   "Q. You just had it in your mind that he was committing a DUI because you saw him four hours earlier, right?
   "A. Yes sir, I did."

7. We recognize that the presumption of the continuation of a state of being is subject to statuto-

ry modification, *e.g.*, NDCC § 39–08–01; Chapter 39–20, NDCC [time limits for administering chemical testing for intoxication].

8. Officer Scharf testified as follows regarding his contact with Swanson while in the Grafton bar:
   "Q. About how close would you say you were to Mr. Swanson at the time you were talking with him in the dining room area of Trax [the bar in question]?
   "A. We were standing face to face, so it would be approximately a foot and a half to two feet apart.
   "Q. Are you familiar with the odor that alcoholic beverages cause when they are consumed by a person?
   "A. Yes ma'am, I'm very familiar with it.
   "Q. Did you perceive that odor on the person of Mr. Swanson?
   "A. Yes ma'am there was a very heavy odor of an alcoholic beverage.
   "Q. What, if anything did you notice about Mr. Swanson's speaking ability?
   "A. His speech appeared to be slurred, and his balance seemed to be somewhat impaired.

servation that Swanson was in an obvious state of intoxication is coupled with Swanson's statement that he would continue drinking through the night, it was not unreasonable for Officer Scharf to conclude that the prior existence of the condition of drunkenness was, in human experience, an indication of its probable persistence or continuation at a later time.[9] *Cf. Zietz v. Hjelle,* 395 N.W.2d 572, 575 (N.D.1986) (Levine J. concurring specially) [notwithstanding lack of evidence of rate of elimination of alcohol, experience and common sense indicated that one who has not drunk for 60 minutes, but smells of alcohol, has slurred speech, and fails a field sobriety test, and who drove 30 minutes earlier, could reasonably be held to have been driving under the influence].

Whether the stop occurred when Officer Scharf physically restrained Swanson, or whether the stop occurred when Officer Scharf pulled up in his patrol car behind Swanson's vehicle in Ratliffe's driveway, if that action would qualify as a stop, is immaterial. In either instance, the stop was justified. The judgment of conviction is affirmed.

SANDSTROM, NEUMANN, LEVINE and MESCHKE, JJ., concur.

"Q. Now how—describe for us what you saw that led you to believe or conclude that his balance was impaired.
"A. A stagger type of walk.
      *      *      *      *      *      *
"A. Because he was visually—he was, in my opinion blatantly intoxicated, and there was no question in my mind that he was over—what I would consider to be under the influence of alcohol.
      *      *      *      *      *      *
"Q. Were any remarks made by him regarding what his plans were for the rest of the evening?
"A. When we were speaking about the situation that had taken place at the residence of Linda Ratliff[e], he stated to me that it was his night to quote, unquote 'to get drunk.'"

9. The fact that Officer Scharf may have observed Swanson driving for one block without incident before deciding to pursue him would not invalidate the stop. *State v. VandeHoven,* 388 N.W.2d 857 (N.D.1986) [Once a reasonable suspicion has been formed, subsequent actions which do not enhance the suspicion are irrelevant to a reasonably prompt stop of a vehicle.]. An officer's subjective decision not to stop a driver whom the officer suspects of committing a crime immediately upon their observation of the driver, but continues to follow the driver for some distance, is of no legal significance in determining whether the officer's stop was supported by sufficient objective facts. *Shull v. Commissioner of Public Safety,* 398 N.W.2d 11 (Minn.Ct.App.1986).