Kody W. WINGERTER, Petitioner
and Appellee,

v.

NORTH DAKOTA DEPARTMENT OF
TRANSPORTATION, Respondent
and Appellant.

Civ. No. 940323.

Supreme Court of North Dakota.

April 19, 1995.

Monte L. Rogneby, Asst. Atty. Gen., Bismarck, for respondent and appellant.

Thomas A. Dickson, Bismarck, for petitioner and appellee.

LEVINE, Justice.

The North Dakota Department of Transportation (Department) appeals from a district court judgment reversing the Department's decision to suspend Kody W. Wingerter's driver's license for driving under the influence of alcohol. Because we hold that NDCC § 39–20–03.1(3) does not require an arresting officer to forward to the Department all records accompanying a driver's blood test, but only a copy of the certified copy of the analytical report, we reverse the district court judgment and reinstate the Department's license suspension.

Sergeant Gordon LaFrance arrested Wingerter for driving under the influence of alcohol. Wingerter consented to a blood test, and a sample of his blood was drawn by a registered nurse at Medcenter One in Mandan. The sample was submitted to the State Toxicologist's office for analysis, which showed Wingerter's blood-alcohol concentration to be 0.17 percent by weight.

At the administrative license suspension proceeding, Wingerter's counsel called as a witness the analyst from the State Toxicologist's office, who analyzed Wingerter's blood sample. She brought with her the complete toxicology file on Wingerter's blood test, which was introduced into evidence. The file contained four documents: a copy of the analytical report of Wingerter's blood test, two computer-generated forms containing the calculations used to determine Wingerter's blood-alcohol concentration, and the form used to keep track of Wingerter's blood sample and its case number.

The two computer-generated forms, containing the calculations used to determine blood-alcohol concentration, revealed that Wingerter's blood sample had to be tested twice. Because the testing procedure shapes the legal arguments and bears upon our resolution of them, we set forth the details of that procedure.

The analyst testified that when a sample of blood is received from law enforcement, it is assigned a case number. Next, the analyst prepares two case samples from the driver's blood sample, and two control samples from a solution with a known alcohol concentration. She then injects the samples into the gas chromatograph, one at a time, in the following order: a control sample, a case sample, the second case sample, and, finally, the second control sample. The control samples are used to verify the accuracy of the analysis of the case samples.

An integrator, working in conjunction with the gas chromatograph, measures the "peak area" (quantity) of alcohol in each sample. The analyst enters the numbers recorded by the integrator into a computer, which performs the necessary statistical calculations for each sample. The computer calculates the driver's blood alcohol concentration by averaging the results obtained for the two case samples.[1] Next, the analyst compares the measured results of each of the case samples and control samples with the acceptance criteria delineated in the "Approved Method."[2] If those results are within the

---

1. Under the "Approved Method To Conduct Blood Alcohol Analysis 2" (February 12, 1993), which the analyst followed, alcohol concentration is determined by linear regression analysis using the following formula:

$$c = \frac{r-b}{m} \times K$$

c = alcohol concentration, grams per 67 ml of urine or 100 ml of blood or other fluids.

r = $\dfrac{\text{Peak height or peak area of alcohol}}{\text{Peak height or peak area of internal standard}}$

b = y intercept

m = slope of the line

K = conversion factor (1.0 for blood, 0.67 for urine) Calculate the average alcohol concentration to three significant figures from the two values obtained [for the case samples] above and report the result to two significant figures.

2. The Acceptance Criteria listed in the "Approved Method" are:
   1. The correlation coefficient as determined via linear regression analysis of the five standards must be >/− 0.999.
   2. The reported concentration of all controls greater than or equal to 0.10 g% must be within 5% of the expected value. Controls <

acceptable range prescribed by the acceptance criteria, the analyst records the driver's calculated blood alcohol concentration, and the date on State Toxicologist form 107, titled "Analytical Report," and signs it. The "Approved Method" does not require completion of an analytical report for a result that does not meet its acceptance criteria. Instead, it instructs the analyst to repeat the analysis. An analytical report, completed by a certified analyst of the State Toxicologist and certified by the State Toxicologist, shows the result of the calculations performed by the analyst and is recognized "as prima facie evidence of the results of a chemical analysis." NDCC § 39–20–07(8).

The analyst testified that during the first attempted analysis of Wingerter's case samples, the "control went out of range," due to human error, and under the "Approved Method," she was required to repeat the analysis. The error, in essence, invalidated the result of the first analysis under the "Approved Method" and made it scientifically inaccurate.

The control was within the acceptable range in the second analysis and this result was used to complete Wingerter's analytical report, which was forwarded to the Department. The hearing officer suspended Wingerter's driver's license, finding that the test was fairly administered and Wingerter's blood-alcohol concentration was 0.17 percent by weight. Wingerter appealed to the district court, arguing that the Department lacked jurisdiction under NDCC § 39–20–03.1(3), because Officer LaFrance failed to forward to the Department the records from both the first and second analyses of the blood sample. The district court agreed, citing our decision in *Bosch v. Moore*, 517 N.W.2d 412 (N.D.1994), and reversed.

The Department appealed, arguing that NDCC § 39–20–03.1(3) requires only a copy of the certified copy of the analytical report of a blood test be forwarded to it and not copies of all records of the analysis of the

blood. Wingerter counters that all records for all tests administered at the officer's direction must be forwarded. Because the analyst did not forward the records from both the first and second analyses of his blood sample, Wingerter contends the Department lacked jurisdiction to suspend his driver's license.

Our review of an appeal from an administrative license suspension is governed by the Administrative Agencies Practice Act, NDCC ch. 28–32, and is limited to the record of the agency. *Olson v. N.D. Dept. of Transp. Dir.*, 523 N.W.2d 258 (N.D.1994). The interpretation and application of a statute is a question of law, which we review de novo. *Id.* We will affirm the agency action, if it is in accordance with the law. NDCC § 28–32–19(1).

Section 39–20–03.1(3) says, in part:

"[T]he law enforcement officer ... shall forward to the director ... a certified copy of the operational checklist and test records of a breath test and a copy of the certified copy of the analytical report for a blood, saliva, or urine test for all tests administered at the direction of the officer."

We have said that NDCC § 39–20–03.1(3) "establishes the prerequisite for the exercise of DOT's jurisdiction." *Bosch*, 517 N.W.2d at 413. In order to obtain jurisdiction to suspend a person's driving privileges, the Department must comply with the basic mandatory provisions of that statute. *Id.*

Section 39–20–03.1(3) plainly and unambiguously requires transmission of only "a copy of the certified copy of the analytical report for a blood, saliva, or urine test." We construe unambiguous statutes according to their plain, ordinary and commonly understood meaning. *Olson*, 523 N.W.2d at 259. In this case, the officer forwarded a copy of the certified copy of the analytical report to

0.10 g% should be within .005 g% of the expected value. If a control falls out of range, the sample on either side of the control should be repeated along with a control.
3. In the analysis of a case sample, the deviation between the average and either one of

the two concentration values should not be greater than 3%. If the difference is greater than 3% then the case sample must be retested.

the Department, as called for under the statute.

Wingerter argues that our holding in *Bosch* that the officer must forward the records for all breath tests conducted at the officer's direction, regardless of their validity, requires the transmission of all records of blood tests. Wingerter's reliance on *Bosch* is misplaced, however, because that case dealt with Intoxilyzer tests.

Section 39–20–03.1(3) distinguishes between breath tests on the one hand, and blood, saliva, and urine tests on the other. For breath tests, it requires the officer to forward "a certified copy of the operational checklist *and test records*," but for urine, saliva, and blood tests, it requires only "a copy of the certified copy of the analytical report," filled out by the State Toxicologist. (Emphasis added.)

In *Bosch*, we read the plain language of the statute ["test records"] to mean that all test records for all breath tests administered by the officer must be forwarded to the Department, leaving the officer who conducted the tests with no discretion to choose which test records to send. *Bosch*, 517 N.W.2d at 413.

■ However, the statute does not require transmission of all test records of urine, saliva, or blood tests; it only requires transmission of a certified copy of the analytical report for each test administered. The statutory distinction between breath tests and blood tests reflects, we think, the expert status of the State Toxicologist's certified analyst, *see State v. Erickson*, 241 N.W.2d 854 (N.D.1976), and is consistent with the purpose of NDCC § 39–20–07 to ease the requirements for admissibility of chemical test results while ensuring that the test upon which the results are based is fairly administered. *State v. Schwalk*, 430 N.W.2d 317 (N.D.1988). We do not accord the same expert status to a police officer conducting breath tests as we do to a certified toxicology analyst operating in a controlled laboratory environment, nor do we apply the same presumption of regularity to a police officer's administration of a breath test. *State v. VandeHoven*, 388 N.W.2d 857 (N.D.1986).

Here, the State Toxicologist's certified analyst followed the "Approved Method" for analyzing Wingerter's blood sample. When the first test was rendered scientifically unacceptable because a control sample fell outside of acceptable limits, she analyzed a second set of case samples and obtained a valid result, which was used to complete the analytical report. There was but one analytical report required under the "Approved Method." The State Toxicologist certified that report and forwarded it to the Department. Section 39–20–03.1(3) requires no more than that. We hold that the Department had jurisdiction to suspend Wingerter's license.

■ Wingerter also moved this court to dismiss or remand, contending that this proceeding violates his right to be free from double jeopardy because there is a criminal proceeding pending against him for driving under the influence of alcohol or with a blood-alcohol concentration of 0.10 percent by weight. However, Wingerter did not raise the double-jeopardy issue at the administrative hearing and it is well-settled that we will not address an issue raised for the first time on appeal. *Choukalos v. N.D. State Personnel Bd.*, 429 N.W.2d 441 (N.D.1988). Nor, ordinarily, will we remand a case to give a party an opportunity to redo what could have been done in the first place. *See, e.g., Price v. Dept. of Transp. Dir.*, 469 N.W.2d 560 (N.D.1991).

■ The final matter to be resolved is the Department's complaint that Wingerter's motion for dismissal or remand is frivolous, justifying an award of costs and attorney's fees under Rule 38, NDRAppP, against his attorney. An appeal is frivolous if it is flagrantly groundless, devoid of merit, or demonstrates persistence in the course of litigation which could be seen as evidence of bad faith. *Mitchell v. Preusse*, 358 N.W.2d 511 (N.D.1984); *Ziebarth v. Farm Credit Bank of St. Paul*, 494 N.W.2d 145 (N.D.1992). However, we do not believe Wingerter's motion is so flagrantly groundless and devoid of merit as to justify an imposition of costs and attorney's fees.

Double jeopardy is a lively legal issue, particularly in the civil forfeiture arena. *See Austin v. United States*, — U.S. —, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *United States v. $405,089.23 U.S. Currency, et al.*, 33

F.3d 1210 (9th Cir.1994); *United States v. McCaslin*, 863 F.Supp. 1299 (W.D.Wa.1994). We want to encourage creative and enthusiastic advocacy on behalf of unpopular defendants and will not impose sanctions against counsel presenting "a good faith argument for an extension, modification, or reversal of the law." *Houser v. Gilbert*, 364 N.W.2d 62, 66 (N.D.1985). While the motion to dismiss or remand was a "long-shot" at best, we prefer to view it as a good-faith effort by an attorney to zealously represent his client. Therefore, we deny the Department's motion for costs and attorney's fees.

The judgment of the district court is reversed and the Department's license suspension is reinstated.

Reversed.

VANDE WALLE, C.J., NEUMANN and MESCHKE, JJ., and GERALD H. RUSTAD, District Judge, concur.

GERALD H. RUSTAD, District Judge, sitting in place of SANDSTROM, J., disqualified.